## E. W. HUNT v. THE STATE.

### No. 902.    Decided April 28.

1. **Evidence—Comparison of Handwriting—Confession Under Arrest.—** Where an application for an attachment, signed by defendant, was offered as a standard for comparison of handwriting, and it was objected that it was inadmissible because it was signed by defendant while he was under arrest and unwarned, *Held*, that the objection was not maintainable, because the application not being an admission nor confession by the defendant tending to show guilt, it did not come within either the letter or reason of the rule excluding confessions made under arrest.

2. **Murder—Self-Defense—Charge—Retreat.—**On the trial of a defendant for the murder of his wife with an axe, where it was proved that he confessed the killing, saying, "She was coming at me with a dagger, and I had to kill her to save my life," and the court charged upon the law of self-defense, but omitted in that connection to instruct the jury that defendant was not bound to retreat, which charge was not excepted to nor instructions asked supplying the omission, *Held*, that objection on account of the omission having been urged for the first time on motion for new trial, was not available unless injury to defendant on account of the omission had been shown, which was not done.

3. **Same—Insanity—Presumption as to Continuance of—Charge.**—Where, on a trial for murder, defendant introduced in evidence a judgment of the County Court showing that he had been tried and convicted of insanity several years before the murder, and the court charged the jury, in effect, that insanity having been established by the judgment, it devolved upon the State to prove beyond a reasonable doubt that such insanity was temporary, and that defendant was sane at the time of the homicide, otherwise insanity would be presumed to have continued, *Held*, the charge was correct under the weight of authority. But see criticism of Hurt, P. J., upon the correctness of the weight of authority.

4. **Same.**—See letters of defendant regarding his wife's sickness, written several days before the killing, to her mother and sister, which the court held evidence clearly proving defendant's sanity, and that he was premeditating the killing, notwithstanding very cogent evidence of defendant's prior insanity had been adduced in his behalf.

APPEAL from the District Court of Grayson. Tried below before Hon. T. J. BROWN.

Appellant was indicted for the murder of May Hunt, his wife, in Grayson County, on the 15th day of December, 1892, by striking her with an axe. The defense was insanity. The trial resulted in a conviction of murder of the first degree, the penalty being assessed at death.

The case on appeal came on for hearing at the Austin Term of the Court of Criminal Appeals, and the judgment was affirmed at that branch on the 21st of April in the opinion which is found below. A motion for rehearing was filed and transferred to the Tyler branch, where it was overruled December 8th. A second motion for rehearing was filed, which was overruled December 18th, and a third motion for rehearing was overruled on December 19th. These motions were all overruled without written opinions.

The following statement of the case as made by the evidence, which is substantially correct, is taken from the brief of counsel for appellant:

The dead body of appellant's wife, May Hunt, was found about 9 a. m. December 15, 1892, just inside of a pasture inclosed by a wire fence, and about two and one-half miles west of Denison, in Grayson County, Texas, and near the camps of Penfield & McDonald, contractors, who were putting in extensive yards for the Missouri, Kansas & Texas Railway Company at that point. She had been struck very heavy blows in the head, and her cheek bones and skull were broken and crushed. At the time the body was found it was attired only in a night-gown. The point where the body was found was eight yards from a public and much travelled road, and the body, which was in no way concealed, could be plainly seen by any one passing along this road, and parties on foot going along the footpath by the road could not avoid seeing the body. This body was found 110 steps from the location of the tent that had been occupied by appellant, his wife, and 16-months old baby up to the time of the homicide. From the tent to

the body there was a plain trail of straw and blood. In what had been the tent was a pile of straw that had been used by appellant and family as a bed, and on the morning that the body was found a pool of blood was discovered in the straw and a bloody sack was lying on the straw. The headquarters of Penfield & McDonald were about 250 yards from appellant's tent, and there were quite a number of camps close around appellant's tent. Hayes' camp was closest, and was about 100 or 150 yards distant. There were thirty-five people in Hayes' camp and about seventy people working around there at the time, and these people did a great deal of passing to and fro around that neighborhood. Appellant's tent was 150 yards from the railway track and within twenty yards of the public road. The skull of May Hunt was so crushed that it was the opinion of the physician who examined her that her head must have been resting against something solid at the time it was struck to have produced its broken and shattered condition. The woman when found was in an advanced stage of pregnancy. On the morning the body was found a sack containing some clothing of a woman and child was also found in an open thicket about forty yards from appellant's tent, and a bloody axe lying in a brush pile with the handle exposed was found about thirty yards from appellant's tent.

On December 4, 1890, at Walnut Springs, in Bosque County, Texas, appellant married May Frye. After their marriage appellant and his wife lived about ten months with Mrs. Frye, appellant's mother-in-law. They then moved to Walnut Springs, Texas; from there they moved to Seldon; from Seldon they moved back to Mrs. Frye's and remained three weeks. They then moved to Wilson County, Texas, where they remained nearly a year, and during 1892 appellant made a crop on the farm of his father in that county, and he remained there until a part of his crop was gathered and until in October, when he left and went to Walnut Springs; they then left Walnut Springs. Appellant is next seen alone working as a teamster for Penfield & McDonald in the yards near Denison in the early part of December. After appellant had worked a short while in the yards he went off and brought back his wife and baby, and occupied his tent up to the time of the homicide.

On one occasion while working in the yards at Denison appellant asked Harrington for an axe, and said that he wanted to use one. At this time there were a dozen axes lying around in the yards, and anybody could have taken one without attracting any attention.

On November 28, 1892, appellant wrote a letter to his sister-in-law, who lived with his mother-in-law at Walnut Springs, and informed her that his wife was very near dead, and that there was no chance for her to live long. He also told her in the letter not to tell Mrs. Frye, unless Mrs. Frye (who was sick) was getting along mighty well. On December 4, 1892, he wrote the same party, "May died to-day at 4 o'clock and

will be buried this afternoon," and that he would come back in a week or two.

At 6 p. m. December 13, 1892, appellant asked a section boss near where he was working on the road to flag a train for him that night, and when the section boss declined, appellant asked the keeper of the section boarding house to flag a train for him that night, and told him that he was going to Fort Worth; said his wife was dead; that he had a 16-months old child and a trunk. The boarding house keeper told appellant if he would wait until morning he would flag the train for him. Appellant made no reply, but left. In going from Denison to Walnut Springs, in Bosque County, one would go by Fort Worth. About dark on the evening of December 14, 1892, appellant called on a boy (Louis Filere) and wanted him to haul him (appellant) from a negro's (Avery's) house to Denison on that night about 11 o'clock. Filere consented to take him to Denison the next morning. As compensation for hauling appellant, his trunk, and child to Denison, appellant gave Filere his tent, and early on the morning and before they started on their way to Denison, Filere went to the tent and took it down and away, and at that time noticed the bloody sack on the pile of straw and a pool of blood in the straw. Filere took appellant to Denison and left him and his baby at the depot. Appellant told Filere that he wanted to take the Fort Worth train, and he also told him that his wife had died three weeks before, near Pottsboro, Texas.

Appellant arrived at Walnut Springs, Texas, with his baby December 15, 1892. In response to questions of his mother-in-law as to what was the matter with his wife, appellant told her that the doctors first said that his wife had congestion; then they said it was meningitis. Upon being asked if May died hard, appellant said she died without a struggle. He said she had a good appetite, and sat up and ate a hearty supper the night she died. Appellant further told Mrs. Frye, that he had two doctors with his wife up to the night before she died, and on that night he had three doctors with her. He also said that he had lived in a good house with two rooms, and paid $10 a month rent for the same; that he boarded his wife at a boarding house the first week she was in Denison at $5 per week; that he dressed her in black. In response to a remark made by Mrs. Frye that he would never see another woman like May, he said, "No, but I think I know where there is one like Frony" (Miss M. S. Frye).

On December 16, 1892, appellant told the witness Grace that his wife had died either on the 4th of December or the 6th. He said the doctors disagreed as to whether she had spinal meningitis or pneumonia.

At the time of his examining trial appellant did not seem to know what a plea of guilty or not guilty was, and the court, after it was explained to him by the county attorney, entered a plea of not guilty for

appellant. Appellant was arrested at Walnut Springs the day after his arrival there, and on December 16, 1892.

After his examining trial appellant told the witness Rich, who was the deputy sheriff in charge of appellant, that he killed his wife with an axe; said that he had to do it; that she was coming at him with a dagger and he had to kill her to save his life; that he was going to plead guilty, and might by so doing save his life. ·

Nobody ever heard of any trouble of any kind between appellant and his wife. His mother-in-law testified, that during the time appellant and his wife lived at her house no trouble ever occurred between them. She thought a great deal of appellant, and appellant thought a great deal of her. The feeling between them was good. She had never heard a cross word between them while they lived with her; they seemed affectionate towards each other while in her house. They got along well. Appellant's mother's testimony is to the same effect.

At the time of the homicide appellant was 27 years old.

These are substantially the facts of the State's case, and are believed to be all of the material facts. The other evidence in the case was that bearing on appellant's sanity.

House, the jailer who had charge of appellant after his arrest, testified, that appellant had two spells, in which he was wild; looked like he did not know what he was doing; tore up his blankets and stuck the pieces out through the bars of his cell. At first the witness thought appellant crazy, but when appellant had his second attack, or spell, because he acted like a crazy man, the witness thought that his insanity was feigned. It was a hard matter for the witness to say whether or not appellant knew right from wrong.

Quarles, a prisoner in jail with appellant, testified to the same acts that House did; thought the appellant was crazy; when he had his spells would know nothing.

Mrs Hunt, appellant's mother, testified, that when appellant was about ten years old a horse ran away with him and he was injured in his head, and that since said injury he had never been right in his mind; that a marked change in appellant had existed ever since he received the injuries. She testified to many irrational acts of appellant; that he struck his sister once without cause or provocation; that he would talk of driving herds of thousands of cattle to Mexico when he had no cattle; would talk of building railroads to Mexico when he had no means; that at times his eyes would dance and fill with water; that he and his family lived in a house on his parents' farm in Wilson County, in 1892; his father furnished him and made his contracts for him, and appellant staid there and made a crop; that his wife went on a visit to her people in Bosque County, and that in October, without any notice to anybody, appellant left, leaving his cotton in the field and his corn in the pen; he had some of his crop of cotton gathered in

his pen; he left four horses and ten head of cattle; left his house locked up, containing his wearing apparel and everything he had uncared for, and carried off the key. No cause for his leaving then was known. He went then to Walnut Springs. No one in Wilson County knew or heard anything about appellant and his whereabouts after he left until the murder of his wife was heard of and appellant's arrest. The witness did not think that appellant knew the nature and quality of his acts, and did not think he would know right from wrong.

Lusk, of Wilson County, had known appellant four years. He testified to delusions of appellant and to his spells of delirium; thought appellant insane, and that at times he would not know right from wrong.

Williams, of Wilson County, had known appellant for several years, and did not think that he had been right since he had known him; testified to wild and irrational talk on the part of appellant.

Kroeger, of Wilson County, had known appellant eighteen years; knew when he was hurt; noticed a change in his conduct before and after he was hurt. After testifying to many irrational acts on the part of appellant, the witness says that he thought appellant would know right from wrong; that it was hard to say.

The judgment of the County Court of Wilson County shows, that the appellant was tried on June 10, 1886, and that the verdict of the jury was that appellant was of unsound mind; that it was necessary that he be placed under restraint; that he had been insane for fifteen years and had been growing worse for the last seven, and the judgment was in accordance therewith.

Dr. J. T. Wilson testified, that he had been seven years in charge of lunatic asylums and had had considerable experience with lunatics; that the universal tendency of young people who are affected with insanity, if not cured, is to grow worse as they grow older, and especially is this so where insanity is produced by blows upon the head which have affected the brain. Persons who have been insane for ten or fifteen years are seldom if ever cured. There are times in the career of those most rabidly insane, and whose minds are completely destroyed, when no external manifestations of insanity can be observed even by experts. The mind may be completely disordered, but the external and observable evidence of it may be wanting.

Harrington knew appellant about two weeks while he was driving a team in the yards near Denison; spoke to him occasionally; saw nothing wrong with him; he drove a team all right.

Deputy Sheriff Creager had known appellant since his arrest and considered him sane; had never spoken to him in his life.

Constable Loving brought appellant back from Bosque County at the time of his arrest; talked with him some then, and considered him sane.

Justice of the Peace Grace knew appellant for about eighteen months and saw him some at Walnut Springs; spoke to him in passing, and did not detect any insanity in him.

White saw appellant three or four times at Walnut Springs, in 1891, had no talk with him; regarded him sane.

Deputy Sheriff Sand. Rich went back and forth with appellant from Sherman to Denison to his examining trial three or four times, a distance of ten miles, and from his association with him then he said he thought appellant sane, and that appellant would know that it was wrong to kill a woman with an axe.

Appellant's mother-in-law, Mrs. N. M. Frye, after two years of intimate acquaintance, testified, that she had never noticed any evidences of insanity in appellant, and that she regarded him as sane.

The charge of the court as to insanity, which is complained of, and defendant's instructions, which were refused, are set out in the opinion.

*Standifer & Epstein* and *C. H. Smith*, for appellant, filed an able and elaborate brief.  Upon the inadmissibility of the application for attachment as a standard of comparison of handwriting, because appellant was under arrest and unwarned at the time he signed it, they cited:  Nolan v. The State, 14 Texas Crim. App., 474; Austin v. The State, 15 Texas Crim. App., 388; Wimberly v. The State, 22 Texas Crim. App. 506; Vickery v. The State, 7 Texas Crim. App., 401; Adams v. The State, 16 Texas Crim. App., 162.

The court erred in failing to instruct the jury on the law of retreat. Penal Code, art. 573; Nally v. The State, 30 Texas Crim. App., 456; Bell v. The State, 17 Texas Crim. App., 550; Arto v. The State, 19 Texas Crim. App., 126.

The court's charges upon insanity were erroneous and insufficient, and the court erred also in refusing defendant special instructions upon that question.  Leach v. The State, 22 Texas Crim. App., 512; Webb v. The State, 5 Texas Crim. App., 596; 1 Greenl. on Ev., sec. 42; Elston v. Jasper, 45 Texas, 409; Wright v. Jackson, 59 Wis., 569.

*Cecil Smith* filed an able argument in support of appellant's motion for rehearing.

*R. L. Henry*, Assistant Attorney-General, for the State.

HURT, PRESIDING JUDGE.—Appellant was indicted in the District Court of Grayson County, on March 18, 1893, charged with the murder of his wife, May Hunt.  He was tried April 15, 1893, found guilty of murder of the first degree, and his punishment assessed at death.  His motion for a new trial was overruled, and he appeals to this court.

A witness (Walker) testified, that a document handed to him was an application for an attachment in this cause, made by defendant Hunt; that the defendant signed the same; that defendant was under arrest and in the custody of an officer at the time he signed the same; that the signature to said application and the signature "E. W. Hunt" to two letters shown him were made by the same person; and that the signature to the application and the writing of the two letters are the same. Another witness testified, that the two letters shown him addressed to Miss Frye and signed "E. W. Hunt," and the signature "E. W. Hunt" made to the application for attachment, were all written by the same person. To this testimony the defense objected, on the ground that the signing of the application was an act required by law in order to secure his rights in the trial of said cause, and was an act done while defendant was under arrest and unwarned. The objection was overruled and the testimony admitted. The State then offered in evidence the two letters referred to, and the defense objected on the ground that the execution of said letters by defendant had not been proved by legal and sufficient evidence. This objection was overruled, and the letters admitted. All of this is presented by bills of exception. In reference to this matter counsel for appellant contends, that under the rule which excludes the admission and confessions of a defendant made while in custody and unwarned the State could not prove the signature to the application executed by him under like conditions. To this proposition we do not assent. The act of signing the document was neither an admission nor a confession by defendant. It was not an act tending to show guilt. It does not come within the letter or the reason of the rule. The fact that defendant was in custody when he signed the application would not likely affect the signature in any manner so as to render it unfit for use as a standard of comparison. That he did sign it was no evidence against him. There was no error in this matter.

2. A confession of the defendant made to the witness Rich was in evidence, to the effect: "I killed her with that axe. I had to do it. She was coming at me with a dagger, and I had to kill her to save my life. I am going to plead guilty, and may by so doing save my life." The court submitted to the jury the issue of self-defense, and no objection is urged to the charge upon that issue, except in that it did not inform the jury that defendant was under no obligation to retreat before killing to save his own life. No objection was made to the charge upon this subject at the time it was given, and no instruction was asked by appellant upon the subject of retreat. The objection was urged for the first time in the motion for a new trial. Under such circumstances, counsel admit that the matter presents no reversible error unless appellant has sustained injury. The question, then, is, has appellant been injured by the failure to so charge the jury? We are of the opinion

that under the circumstances of this case no possible injury could result to the defendant. His statement is clear, plain, and emphatic: "She was coming at me with a dagger, and I had to kill her to save my life." To the reasonable mind this presents but one inquiry: Did defendant speak the truth in saying that she was coming at him with a dagger? No ordinary juror or person would pause to inquire as to the possibility, the practicability, or the obligation to retreat to avoid slaying. If the jury believed this statement of defendant, he was entitled to an acquittal, and the jury were in effect so informed in the charge given.

3. The question of defendant's sanity was raised by evidence in the case. The jailer having charge of defendant after his arrest testified that he had two spells in which he was wild. "Looked like he did not know what he was doing. Tore up his blankets, and stuck the pieces out through the bars of his cell." At first he thought he was crazy, but when he had the second attack the witness thought the insanity feigned. It was a hard matter for witness to say whether or not defendant knew right from wrong. Quarles, a prisoner in the jail, thought the defendant crazy. When he had his spells, would know nothing. Appellant's mother testified, that when he was about ten years of age a horse ran away with him and he was injured in the head, and since said injury defendant had never been right in his mind; a marked change existed ever since the injury. She testified to many irrational acts; he struck his sister once without cause or provocation; he would talk of driving herds of thousands of cattle to Mexico; talk of building railroads to Mexico when he had no means; his eyes would dance and fill with water. He and his family lived on a farm in Wilson County in 1892. His wife went on a visit to her people in Bosque County, and in October, without notice to any one, he left, leaving his cotton in the field, his corn in the pen, his house locked up, and went to Walnut Springs. No one in Wilson County knew or heard anything about him after he left until the murder and his arrest. Did not think that defendant knew the nature and quality of his acts. Did not think he would know right from wrong. Lusk, a witness from Wilson County, had known him four years. He testified to delusions of defendant and spells of delirium. Thought him insane. At times he would not know right from wrong. Williams, a witness from Wilson County, had known him for several years. Did not think he had been right since he had known him. Testified to wild and irrational talk. Kroeger, a witness from Wilson County, had known him for eighteen years. Knew him when he was hurt; noticed a change in his conduct before and after he was hurt. Testified to many irrational acts. Thought he would know right from wrong; it was hard to say. Dr. Wilson testified, that he had been seven years in charge of lunatic asylums; that the universal tendency with young people affected with insanity, if not cured, is to grow worse as they grow older, and especially is this the

case where insanity is induced by blows upon the head which have affected the brain. Persons who have been insane for ten or fifteen years are seldom, if ever, cured. There are times in the career of those most rabidly insane, and whose minds are completely destroyed, when no external manifestations of insanity can be observed, even by experts. The mind may be completely disordered, but the external and observable evidence of it may be wanting. There was put in evidence a judgment of the County Court of Wilson County, from which it appears that defendant was tried in that court upon a charge of unsound mind on the 10th day of June, 1886. Upon the issue submitted, the jury in the case returned the following verdict: "(1) Is Elijah Hunt of unsound mind? Answer—He is. (2) If defendant is of unsound mind, is it necessary that he should be placed under restraint? Answer—Yes; it is. (3) If you answer both the foregoing questions in the affirmative, then state what is the age and nativity of defendant. Answer—19 years; native of Texas. (4) How many attacks of insanity has he had, and how long has the present attack existed? Answer—He has been insane for fifteen years. Has been growing worse for the last seven years." Upon this verdict the court adjudged Hunt to be of unsound mind, and ordered his restraint until such time as he could be received in the asylum at Austin.

Upon the character of mental disorder which will exempt from punishment, the learned trial judge gave a very admirable charge, and the charge relating to the issue of insanity is objected to solely upon the subjects of reasonable doubt, presumption, and the burden of proof. That part of the charge complained of is as follows: "The law presumes every person to be sane until the contrary is established. The judgment of the County Court of Wilson County, read in evidence before you, conclusively establishes that the defendant was of unsound mind on the 10th day of June, 1886, and it was at that time necessary that he (defendant) should be placed under restraint; but it is not conclusive as to his subsequent condition of mind. The condition of defendant's mind at the time the killing occurred (if you believed he killed deceased) is the matter to be determined under the plea of insanity, and is to be determined from all the evidence bearing upon that question. If you believe from the evidence that defendant was not restored to reason, and that subsequent to the date of said judgment the defendant was afflicted with chronic or habitual insanity to that degree that he would not know what he was doing in the commission of such a crime as that charged in the indictment, or if he did know what he was doing, then that he did not have sufficient reason to comprehend its character and consequences and to know that it was wrong to do the act, then it devolves upon the State to prove beyond a reasonable doubt that the killing of May Hunt by defendant (if you believe that he killed her) occurred at a time when defendant was in a

condition of mind called 'a lucid interval'—that is, that at the time defendant killed deceased (if he did kill her) his mind was in a condition that he knew what he was doing, and that he knew that the act was wrong, and that he had sufficient will power to control his action; and if the evidence satisfies you that defendant has, since the date of said judgment, been afflicted with chronic or habitual insanity of the character and degree above defined, and if the evidence does not satisfy you beyond a reasonable doubt that at the time of the killing of May Hunt (if you believe that defendant killed her) he was in a condition of mind to know what he was doing, and that the act was wrong, and that he had sufficient will power to enable him to refrain from such act, you will find him not guilty." . "If, however, you do not believe from the evidence that defendant had been afflicted with that character and degree of insanity defined and described in the preceding charge, and if you should believe from the evidence that defendant has, since the date of the judgment read before you, been afflicted with recurrent insanity—that is, that he was at times sane and at other times insane— then it devolves upon defendant to prove by a preponderance of the evidence, to your satisfaction, that at the time he killed the deceased (if he killed her) he was laboring under such defect of reason from disease of the mind that he did not know what he was doing, or if he did know, that he did not know the difference between right and wrong of the particular act, and that he did not comprehend the character and quality of such act; and if it has not been so proved, the defense of insanity can not avail the defendant if you believe he is otherwise guilty as charged."

The defendant requested the following charge, which was refused: "The defendant having introduced a judgment of the County Court of Wilson County establishing the insanity of the defendant, you are instructed that said judgment conclusively establishes the insanity of defendant at the time the judgment was rendered; and unless the evidence introduced on this trial establishes to your satisfaction, beyond a reasonable doubt, that the insanity of which defendant was convicted was temporary in its character, or that defendant has been cured of his insanity, you are instructed that defendant is presumed to have continued to be insane from the time of said judgment until the present time, and that it devolves upon the State to establish by evidence to your satisfaction, beyond a reasonable doubt, that defendant was in possession of his mental faculties sufficiently to understand the motive of his act, and sufficiently to be able to refrain from doing the same, at the time May Hunt was killed (if from the evidence and instructions herein given you find defendant killed her), before you can convict him of any offense." The refusal of this charge is complained of as error, and presents the serious question in this case. The charge of the court upon the subject of insanity very clearly presents four

propositions: (1) That the law presumes sanity, and the burden is on accused to prove insanity at the time he committed the homicide. (2) Chronic insanity having been shown, the burden of proof is on the State to prove, beyond a reasonable doubt, sanity at the time of the homicide. (3) Unless chronic insanity is shown to have existed previous to the homicide, then the burden is on the accused to prove insanity at the time he killed his wife. (4) The judgment of the court establishing insanity having been put in evidence, the burden is upon the State to prove, beyond a reasonable doubt, that the insanity of which defendant was convicted was temporary, or prove that he had been cured of such insanity; otherwise, insanity is presumed to have continued.

Under the weight of authority and the decisions of this court, the charge was correct under the evidence. The writer has not assented to these decisions, and is of opinion that when the evidence in a case raises the issue of insanity there is no presumption of law; that the presumption is, under all the circumstances, one of fact for the jury to determine, and that unless the jury believe, beyond a reasonable doubt, that the accused is sane, they should acquit. If the insanity, at the time of the judgment declaring defendant insane, was permanent—chronic—it would likely remain. If of a temporary character, appellant may or may not have been sane when he killed his wife. The judgment does not inform us of the character of insanity of which defendant was afflicted, and if it had found that defendant was afflicted with chronic insanity it would not have been conclusive of that fact. Now, in determining the character of the insanity, the conduct of defendant before the judgment, after the judgment, and up to and after the homicide, should be looked to, and if found sane at the time of the homicide, the insanity established by the judgment years before was not permanent. If insane at that time it may have been of that character, or it may have been temporary, and defendant may have killed his wife while temporarily insane. These observations show that the theory to be determined is a question of fact merely—the condition of defendant's mind when he slew his wife. Now, if defendant was not permanently insane when he was so declared to be by the judgment, it would not be just to the State to charge the presumption that insanity is presumed to continue. In short, the presumption has no place in the case—can not be used for any purpose until the whole of the evidence has been introduced; and when this is done, the character of insanity may appear. It is true, that along with all the evidence bearing upon the question of sanity the judgment should be considered, and the main fact be determined by all the evidence in the case.

Counsel for appellant contend that the verdict is against the evidence, that insanity was shown, and that the jury should have acquitted defendant upon that ground. We concede that there is very cogent

evidence of insanity; but on the other hand the proof of sanity is clearly made. The letters written by defendant regarding his wife's sickness and death, several days before he killed her, evidence not only sanity but that he was premeditating her death, and was preparing her mother and sister for that event.

We can not disturb the verdict of the jury, and the judgment is affirmed.

*Affirmed.*

Judges all present and concurring.