## BILL ROSE V. THE STATE.

No. 15850. Delivered May 17, 1933.
State's Rehearing Granted June 23, 1933.
Reported in 62 S. W. (2d) 121.

The opinion states the case.

*Geo. L. Huffman,* of Marshall, for appellant.

*Lloyd W. Davidson,* State's Attorney, of Austin, and *Benjamin Woodall,* County Attorney, of Marshall, for the State.

MORROW, PRESIDING JUDGE.—Assault with intent to murder is the offense; penalty assessed at confinement in the penitentiary for twelve years.

It is claimed by the state, and affirmed by W. R. Muse, that an assault to murder upon the said Muse was made upon the 29th day of September, 1930, in the city of Marshall, Texas. The testimony of Muse and others is sufficient to support the finding of the jury that the assault was made by the appellant with the intent to kill Muse. By a number of witnesses, including Tex Rhodes, the appellant set up the defense of alibi, claiming that at the time of the injury the appellant was not at Marshall, Texas, but was at McLean, in Gray County, which is many miles from Marshall.

Tex Rhodes was twice called by the state. When first called for the state, he testified that his name was Sidney W. Rhodes; that he had had no correspondence with the appellant, Bill Rose, after the latter left McLean, Texas. On the 15th of November, 1931, Rhodes' postoffice address was Box 396, McLean, Texas. From the testimony of Rhodes we quote: "I can't swear that this letter you show me was written by Bill Rose and that is his signature. * * * I don't remember if I ever received a letter from him. Bill's name is signed to the letter that you show me.". On cross-examination the witness testified: "I can't say that is Bill's handwriting on that envelope. I can't identify it as Bill Rose's handwriting. * * * I cannot tell that is Bill's handwriting (letter G-2) from the way the word 'Bill' is written. I do not know whether Bill Rose wrote this letter." On re-direct examination Rhodes testified: "I believe that Bill Rose lived at 210 Lake Street, Marshall, or 207. * * * I had not written Bill Rose a letter prior to the receipt of this letter. I don't remember if Bill wrote me a letter after he left McLean."

In answer to a question as to whether, on cross-examination, Rhodes identified the signature as being that of Bill Rose, he

said: "I identified his name." The witness, in effect, declared that he had no recollection of having written appellant a letter or having received one from him. The effect of Rhodes' testimony was that he could not identify the letter as having come from the appellant or was in the handwriting of the appellant.

On his second recall, the attorney for the state asked Rhodes questions which he answered thus: "Yes, sir, before the jury retired you asked me about whether I received that letter at any time last year (G-2). I read that letter that you showed me. Yes, I got that letter. I was at McLean, Texas, when I got that letter."

The receipt of this testimony was opposed upon the ground that the letter was not identified as coming from the appellant, Rose. However, the letter was received in evidence over the objection of the appellant, its purport being to outline certain suggested testimony that the witness Rhodes should give tending to support the theory that the appellant, at the time the offense is charged to have been committed, was at McLean, Texas, and not at Marshall, Texas. The envelope was addressed to S. W. Rhodes, Box 396, McLean, Texas, and on the back of it, there appeared the following: "From 207 Lake St., Marshall, Texas." The letter purported to bear date the 14th day of November, 1931.

The witness John Pool testified that he was a deputy sheriff of Rusk County and had charge of the jail at Henderson, Texas; that on the 5th of March, 1931, appellant was in jail and in custody of the witness, and on said date Rose gave Pool a letter marked for identification "G-1," which letter Pool delivered to the district attorney. On cross-examination Pool said: "I don't know that I saw Bill Rose write that letter. He gave it to me to put in the United States Post Office. * * * I diverted it from the United States Post Office and gave it to the District Attorney. It was not sealed, and I censor all the mail from the jail. * * * Bill Rose was under indictment in Rusk County. * * * I don't know that I would know Bill Rose's handwriting if I would see it. I know that Bill Rose wrote that letter and gave it to me to mail. I didn't see him write it. I didn't have to have permission from Bill Rose to read his mail. It is our custom to go through all mail going out not sealed. * * * That letter is addressed to Mr. Robert Rose at Navasota, Texas, General Delivery, after five days return to W. R. Rose, County Jail, Henderson, Texas." The letter in question was written at Henderson, Texas, March 5, 1932, and addressed to Mr. Robert Rose and Family.

The state introduced the witness Gordon M. Boone, assistant cashier of the First National Bank, who stated that he had had experience as a banker and had handled a great many checks; that on an average he handled from one to two hundred checks a day. The witness testified: "In my position I have occasion to compare signatures and handwriting of various customers. I have to do that frequently. You have handed me two letters and have asked me if the signature (letters 'G-1' and 'G-2') and letters are written by the same man, and it is my opinion that they are written by the same person." On cross-examination Boone testified: "I don't know who wrote those letters; I merely compared the handwriting of the two letters and I think it is very similar. * * * In my opinion those two letters were written by the same man."

In support of the conclusion of the learned trial judge that the testimony was admissible in evidence against the appelllant, he refers, in qualifying the bill of exception, to the following cases: Jones v. State, 165 S. W., 144; Ferguson v. State, 136 S. W., 465; Hunt v. State, 26 S. W., 206; Williams v. State, 11 S. W., 482; McKee v. State, 42 S. W. (2d) 77.

The opinion is entertained that neither of the letters marked "G-1" and "G-2" was admissible in evidence against the appellant.

In the Kennison case, 260 S. W., 174, the offense was forgery. While the accused was in custody, the district attorney caused him to write the words "February," "Texarkana," "J. E. Richardson," and also his own name on a paper. These writings were used against the appellant in making comparison with the alleged forged document. Holding that the procedure was reversible error, the court reaffirmed a previous announcement as follows: "The statute relating to confessions is not confined strictly to a technical confession, but covers any act in the nature of a confession, statement or circumstance done or made by defendant while in confinement or custody, and not having been properly warned, which may be used by the state as a criminative fact against him." (Branch's Ann. Tex. P. C., p. 32, sec. 59.)

Supplementing the authorities cited by Mr. Branch under the proposition mentioned, this court, in the Kennison case, made reference to many others to the same effect. Commenting upon the precedents to which we have been referred in the present case, this court, speaking through Judge Hawkins, made the following remarks in the Kennison case: "The learned trial judge, with his usual care and caution, justifies his recep-

tion of the evidence complained of by the opinions of this court in Ferguson v. State, 61 Texas Crim. Rep., 152, 136 S. W., 465, and Hunt v. State, 33 Texas Crim. Rep., 252, 26 S. W., 206. The Hunt case, although it does not refer to it, evidently followed Williams v. State, 27 Texas App., 466, 11 S. W., 481; hence we review the three cases mentioned. Williams was charged with theft of horses. He defended on a bill of sale which the state claimed to be bogus and manufactured by accused for defensive purposes. He had signed applications for continuance and for attachments for witnesses. His signature to those instruments were admitted as standards of comparison to show that he also wrote the bill of sale. It was held (Judge Willson writing the opinion) that the introduction in evidence of the signatures did not violate the rule which excludes a confession made while the accused is in jail. Hunt was charged with the murder of his wife. Two letters were in possession of the state signed by Hunt; they were incriminative. Hunt also had made and signed an application for attachment for witnesses, and this signature was used as a standard of comparison with the signature to the letters to prove their execution by accused. Ferguson was charged with theft of horses, and produced a bill of sale accounting for his possession. He had signed an appearance bond, and this signature was used to show the similarity between it and the writing in the bill of sale, it being contended by the state (as it was in Williams' case) that Ferguson had manufactured the bill of sale."

The facts in the Ferguson case, supra, distinguish it from the present appeal by the fact that the standard of comparison permitted in the Ferguson case was to the effect that the appearance bond signed by the appellant to secure his release in the particular case on trial was an official document; and by reason of its official character and the necessity therefor to secure the release of the accused, it stood upon a different footing from a private letter or the mere writing of words for the purpose of comparison. The Ferguson case is in line with Hunt's case (33 Texas Crim. Rep., 252), where the document was a bill of sale executed by the accused and found in his possession. Note of the distinction was made by the court, speaking through Judge Hawkins, in the Kennison case, supra. The case of Jones v. State, 73 Texas Crim. Rep., 152, 165 S. W., 144, is also distinguished with the statement that the bills of exception in that case were imperfect. The ruling of the court, though properly presented by bills of exception, could not be

followed because of the conflict with the statutory provisions to which reference is made in the Kennison case, supra.

Adverting to that phase of the present case in which the deputy sheriff received a letter from the appellant for mailing, which letter was subsequently introduced in evidence for the purpose of comparison, in addition to the remarks in the Kennison case to which reference has been made, we refer to the cases of Phillips v. State, 6 Texas App., 364, and Hatch v. State, 6 Texas App., 384, in which it is made plain that under the law of this state, in order to establish handwriting by comparison, it is essential that there must be proof clearly showing that the document used for comparison was written by the accused on trial. In the present instance, it was not shown that the letter to which the deputy sheriff refers was written by the appellant. The testimony of the expert introduced to prove the identity by comparison, founded as it is upon letters not shown to have been in the handwriting of the appellant, cannot be effective against the appellant. The latest expression on the subject embraced in this appeal will be found in the case of Blackshear v. State, 58 S. W. (2d) 105, which accords with the conclusion announced in the Kennison case, supra.

For the reasons stated, we are constrained to conclude that the proper disposition of the case demands that it be reversed and remanded. It is so ordered.

*Reversed and remanded.*

### ON MOTION FOR REHEARING.

LATTIMORE, JUDGE.—Upon mature consideration we are of opinion that we erred in directing a reversal of this case for the admission of two letters, marked for identification "G-1" and "G-2." We note that letter G-1 was not allowed to go to the jury, it being admitted for no other purpose than as a basis for comparison with the handwriting of the letter G-2. Mr. Pool testified that on March 5, 1932, he was jailer at Henderson, and had appellant in custody, and that appellant on that date handed to him the G-1 letter, which was addressed to Robert Rose and family, Navasota, Texas, General Delivery, and on the envelope of which appeared the following: "After five days return to W. R. Rose, County Jail, Henderson, Texas." The letter contained nothing material to this case, and concluded as follows: "Write more next time. Answer soon. As ever, Bill." Underneath the word "Bill" was written the following: "W. R. Rose, Henderson, Texas." Mr. Pool, on cross-examination, said he did not see appellant write the letter, and did not know that he

would know appellant's handwriting, but said positively "I know that Bill Rose wrote that letter and gave it to me to mail." We have no means of knowing how the witness knew that appellant wrote the letter, but he affirmed this as a fact, and this court can not enter into any speculation in order to hold the letter inadmissible. It might easily have been that within Mr. Pool's knowledge no one else was in the cell or jail but appellant. We decline to speculate or imagine. The witness swore that he knew that appellant wrote the letter, and this established it as a genuine writing, hence usable as a standard of comparison.

Nor do we think the fact that appellant wrote it while in custody and unwarned, would make it inadmissible as such standard. There is an utter lack of anything or everything which would call for its rejection as purely a standard of comparison, under our statutes relating to confessions. What appellant therein said was not introduced. The only thing in evidence, even before the court, was the manner and form of the writing. This question first seems to have come before this court in Williams v. State, 27 Texas App., 471, opinion by Judge Willson, in which it was held not error to introduce as a standard for comparison of handwriting only, the signatures of the accused to applications for continuance and for attachments. This court said: "The applications were not read in evidence, and the introduction in evidence of the signatures thereto did not violate the rule which excludes a confession of a defendant made while in jail or other place of confinement." Again in Hunt v. State, 33 Texas Crim. Rep., 252, an application for attachment signed by the accused while under arrest and unwarned was admitted over objection and used as a standard of comparison. The accused contended that the signature made under such circumstances could not be so used under the rules excluding the acts and conduct of the accused when in custody and unwarned. Presiding Judge Hurt said as follows: "To this proposition we do not assent. The act of signing the document was neither an admission nor a confession by defendant. It was not an act tending to show guilt. It does not come within the letter or the reason of the rule. The fact that defendant was in custody when he signed the application would not likely affect the signature in any manner so as to render it unfit for use as a standard of comparison. That he did sign it was no evidence against him. There was no error in this matter."

In Ferguson v. State, 61 Texas Crim. Rep., 152, upon citation of the Hunt case and quotation therefrom, Presiding Judge Davidson held that the signature of the accused to an appear-

ance bond while in custody and unwarned, was usable as a standard of comparison. See, also, Jones v. State, 73 Texas Crim. Rep., 152. In the Kennison case, 97 Texas Crim. Rep., 156, when the court was constituted as at present, the authorities above referred to were discussed and on the facts of that case differentiated. Said case on its facts showed that the accused was brought from the jail to the office of the prosecuting attorney. His presence there was not voluntary. He was caused to write several words which were later admitted, over objection, apparently as standards of comparison with the alleged forged instrument. Judge Hawkins, referring to the authorities above mentioned, says: "In each of them the accused of his own volition had signed papers in preparation of his case for trial or to secure his release from custody. * * * How different in the present case; here appellant is charged with forgery and with passing as true a forged instrument, either being offenses which involve the making of an instrument in writing, and for the very purpose of securing from him evidence tending to show his guilt, the prosecuting officers procure appellant's removal from the jail to their office, and under their direction secure from him not his signature alone but a writing of many of the identical words in the alleged forged instrument, evidence later used to bring about his conviction."

There is not a word in what is thus said in any way contravening the admissibility of the letter G-1 for purposes of comparison, it being the result and creature wholly of appellant's volition without coercion, suggestion, or pressure from any outside source. It was not intended by this court in what was said in the Kennison case, supra, to convey the idea that the willing or voluntary signing by the accused of a document for use in some way in his case while he was under arrest, would derive from its intended use any element of admissibility. Such contention would be manifestly unsound and wholly aside from the question being discussed in said case. Another case by this court discussing the same principle is Bell v. State, 99 Texas Crim. Rep., 63, in which Judge Hawkins cites the authorities herein relied upon with approval, in holding admissible a document signed by the accused while before a grand jury as a witness. The question in that case was not the admissibility of documents signed by the accused while under arrest, but of documents signed while before a grand jury, the ground of objection being that this was divulging the secret proceedings of a grand jury—a somewhat analogous question. In Long v. State, 120 Texas Crim. Rep., 373, we upheld the doctrine of the

cases here relied on. We have no doubt of the admissibility of the letter G-1 as a standard of comparison of handwriting.

Going back to the G-2 letter, there is no sort of doubt of its admissibility if the G-1 letter was admissible. A banker of experience compared the two letters and said they were in the same handwriting. Words in each appear misspelled the same way. Identical expressions, characteristic of the writer in identifying him, are found in both.

Wholly aside from the establishment of its admissibility as a result of such comparison, however, to the writer the admissibility of the G-2 letter is clear from the facts in evidence. Appellant's brother-in-law, and a strong witness for him to his alibi, with reluctance admitted the receipt of letter G-2 about November 16th, 1931, but coupled this admission with the statement that he did not do the things "Bill Rose asked to be done in that letter." Evidently the exhibition to him by state's counsel of said letter, when he was recalled by the state after having testified for the defense to a complete alibi for appellant, was a surprise. He had lost the letter at McLean. It was found by the hotel man, Mr. Williams, who had sent it to the state's attorney at Henderson. No mention of said letter was made by the state in making out its case in chief. No question regarding it was asked Rhodes when on the stand for the defense, in making out appellant's alibi in exact accordance with the requests in the letter. No question about the letter was asked other witnesses for the defense, including those named in the letter as those whom the writer desired Rhodes to see and whose assistance he was requesting in making out his alibi; as one after another of these took the stand and apparently followed the suggestions in the letter, each and all swearing that beyond peradventure appellant came to McLean, Texas, 600 miles from the scene of the assault, on or before September 10, 1931, and was not away from said place as much as a day until October 14, 1931, when he left to go back to Marshall with the body of young Foster who had been killed in a truck accident. Almost all these witnesses were armed with incidents occurring on the very day of the assault, September 29, 1931. The witnesses were testifying nearly a year after that date. One of them remembered the hour at which appellant arose on the morning of September 29th. Another remembered that he and appellant ate hot cakes together that morning at a cafe, and that he ate a steak for supper that night at the same place. After some twelve of these witnesses had tracked each other down the alibi path, the defense rested.

The state after calling back two of the main alibi witnesses and having them admit that they were under indictment for felonies, called back Mr. Rhodes, brother-in-law of appellant and a strong witness to his alibi. He was asked if he had had any correspondence with appellant after the latter left McLean. He said he had had no character of such correspondence. Asked if he received a letter from appellant, he said he did not remember it. He admitted that his initials were S. W., and that his post-office address on November 15, 1931, was box 396, McLean, Texas. He also said that at that time appellant lived at 207 Lake Street, Marshall, Texas. Shown the G-2 letter, he said he could not swear it was written by appellant. He said: "That is his name. That is his signature. Yes, that is his signature. You have asked me if I received a letter on or about the 15th day of November, 1931, from Bill Rose in that envelope, and I will say I can recall it." He also said: "Yes, after Bill Rose left the city of McLean, Texas, I did receive some character of communication from him. I don't know that that is the letter I received from him (G-2). Yes, if you read it to me I will know." Here the jury was withdrawn. The witness then said: "You have read that letter to me in full (Exhibit G-2) under date Marshall, Texas, November 14, 1931, and addressed to Mr. Tex Rhodes, Dear Friend, etc., and that is the letter that I received." He also said: "I believe that Bill Rose lived at 210 Lake Street Marshall or 207. It is correct that he lived at 207 Lake Street." Later he again positively admitted getting the G-2 letter while at McLean, which was addressed to S. W. Rhodes, P. O. Box 396, McLean, Texas, and had on the envelope from "207 Lake St., Marshall, Texas." He said that he got affidavits from Leon Marshall and his wife who were running a cafe at McLean, and that Fat Bentley,—named in the letter,—was running a filling station in McLean. He testified: "He is the man that Bill Rose requested me in this letter to get the gas tickets from." The G-2 letter is as follows:

"Marshall, Texas, Nov. 14, 1931.

"Mr. Tex Rhodes,
"Dear Friend:

"I will answer your letter I rec. this morning. Sure was glad to hear from you. Well, this leaves me OK, but not out of trouble yet. Well, listen, this is what I want you to do now, and boy be sure and do it, for it is all that will do any good. Well, I told Harry to do some of it. But I have not heard from him yet. Listen, I want you to go around to Bill Cafe and get three meal tickets from him and punch the 3 of them out, and

let Bill sign my name on them and date one of them on the 29th Sept. That is when that crime happened. Now, what I have got to do is prove that I was out there on that day, and all so the day after and the day before, witch was on the 28th of September. Now, listen, you goe to Fat Bentley and get several gas tickets and tell him to Be sure and Make out several of them so they can show that I was up there that week, Far sure, and tell Fat to keep a carbon copie of them, and tell Fat to swear that I got Gas there on that day witch was the 29th of Sept., and tell him I was driving Miller truck and stick to it, and tell Leon wife to swear I eate 3 meal in Bill Place that day, that is all that will do me any good at all. Boy, they are going to try to put me in the chair far that god damn mess. Boy, I am going to have ever one up there brought here, because I sure am going to need them. You tell every one when that happen. Well, I had my hearing today and they set my bond at $5,000.00. I don't know who in the hell I will get to make it. It sure is plenty high. They got 2 charges against 3 of us. Well, they did not set the date of trial yet. So, I guess they will come and get me tomorrow and take me back to jail. Now, all I ask you to do is be sure and get thes thing for me. listen, tell Bill Bentley that I ate in there on that day and date this meal tickets about 5 or 6 days apart. but Be sure and date them right and kinder mess them up a little so it will show up, and I did not tell them about this when they ask me a feq question about where I was at and how long I was up there. Well, if I was up there I could fix everything up all wright, But I couldnot leave here. So, I have to get some one there that I can depend on. So, I will ask you to do this for me. The more witnesses I can get, why the better. there is just a few people that realize the trouble I am in, and Boy it is a pretty good frame up to. Old John Taylor is going help prosecute me, and he is going to ask the limit, and I have got to have some pretty good evidence to lay in front of him to. Well, Tex Mama and Ed went to Parris the other day to see what they could do up there about getting uncle Jim to help out a little, and he is broke. Well, I haven't got no money to hire a lawyer with. All of them lawyers here want from $500.00 and up. Well, I aint got a nickle in this world and I don't know what I am going to do. Well, I will close this so you get this stuff and please send it back here just as quick as you can. Now, if you dont, why I will be blowed up. Answer back soon.

"207 Lake St., Marshall, Texas. Bill."

"The envelope shows post marked L. Rock & Ft. Worth

train, 15th November 1931 R. P. O. Addressed to Mr. S. W. Rhodes Box 396, McLean, Texas. On back of envelope 'From 207, Lake St., Marshall, Texas.' "

Rhodes having twice sworn that this letter bore appellant's signature, that he (witness) got it, addressed to his proper address; that it was signed with appellant's name, and had appellant's home address as the return address on the envelope, coupled with the familiar references and exact instructions, which appear to have been in line with what was done after the receipt of said letter—all seem to point unerringly to appellant as the writer of the letter and the instigator of fabricated testimony, and seems clearly admissible.

The state also introduced J. B. Williams, who swore that he was operating the Irvine hotel at McLean, Texas, about the 15th of November, 1931, at which time Rhodes, Zaner, Potter and Bechtold, all of whom were alibi witnesses for appellant, lived at said hotel. He recalled that a young man was killed out there in a truck accident, and that appellant was staying at the hotel and contemplated going back to Marshall with the body. Witness overheard some one talking and thought it was appellant and Rhodes. Appellant was talking of going back to Marshall to the boy's funeral, and Rhodes said to him: "You had better not go down there; you know damn well they will put you in jail." Appellant replied that he had been watching the papers and had not seen anything about it. Witness also heard the boys say: "We can prove you were up here." Something was said like "We could swear you out of hell." Some one said, "There is enough of us to swear you out of hell." Nothing was said in that conversation about appellant being in McLean on September 29th.

Being of opinion that we were in error in holding said letters inadmissible, the state's motion for rehearing is granted, the judgment of reversal is set aside, and there being no other complaint, and the evidence being sufficient, the judgment of the trial court is now affirmed.

*Affirmed.*