## MARSHALL JORDAN v. THE STATE.

### No. 1055.   Decided November 1, 1911.

### Rehearing denied December 20, 1911.

**1.—Murder—Charge of Court—Insanity.**

Where, upon trial of murder, there was evidence as to the insanity of the defendant and the court charged upon this issue according to the precedents laid down by this court, and, in fact, submitted the same more favorably to the defendant than was necessary, there was no reversible error.

**2.—Same—Evidence—Nonexpert Opinion—Insanity.**

Where, upon trial of murder, the witnesses who testified on the question of insanity were nonexpert, and before their opinion was elicited on the question of the defendant's sanity or insanity were interrogated by both sides as to their means of knowledge gathered from defendant's acts and conduct; and there was no objection as to the witnesses' means of observation, there was no error.

**3.—Same—Evidence—Bill of Exceptions.**

In passing on a bill of exceptions, the Appellate Court does not go to the statement of facts to look up the testimony in passing on such bill, and unless the bill is sufficient in itself, the matter can not be reviewed.

**4.—Same—Charge of Court—Insanity—Nonexpert Opinion.**

Nonexpert witnesses, when they are shown to have had a sufficient knowledge of the accused for a sufficient length of time and came in contact with him and have had conversations and business relations with him for any considerable period of time, based solely on their own knowledge and observation, can express an opinion as to the sanity or insanity of the accused; and where witnesses in a murder trial were not asked their opinion of the sanity or insanity of the defendant until after he had opportunity by his counsel to thoroughly cross-examine the witnesses upon their means of observation, there was no error.

**5.—Same—Sufficiency of the Evidence.**

Where, upon trial of murder, the evidence sustained a conviction of murder in the second degree, there was no error.

**6.—Same—Motion for Rehearing—Practice on Appeal.**

Complaints made in the briefs of counsel or in assignments that are not based upon a specific ground pointed out properly in the court below, or in motion for rehearing in this court, can not be considered; there being no motion to amend at the proper time requested.

Appeal from the District Court of Taylor.   Tried below before the Hon. Thomas L. Blanton.

Appeal from a conviction of murder in the second degree; penalty, twenty-five years imprisonment in the penitentiary.

The opinion states the case.

*S. W. Bishop* and *J. R. Stubblefield,* for appellant.—On the question of evidence and charge of court: Guffee v. State, 8 Texas Crim. App., 187; Ainsworth v. State, id., 532; Dent v. State, 46 Texas Crim. Rep., 166; Cannon v. State, 41 Texas Crim. Rep., 467.

On question as to non-expert opinion on insanity: Wells v. State, 50 Texas Crim. Rep., 499; Betts v. State, 48 Texas Crim. Rep., 522; Turner v. State, 61 Texas Crim. Rep., 97, 133 S. W. Rep., 1053; Burton v. State, 51 Texas Crim. Rep., 196; Simms v. State, 50 Texas Crim. Rep., 563; Williams v. State, 37 Texas Crim. Rep., 348; Henderson v. State, 49 Texas Crim. Rep., 511, 93 S. W. Rep., 550.

*C. E. Lane,* Assistant Attorney-General, for the State.

PRENDERGAST, Judge.—The appellant was duly indicted by the grand jury of Eastland County, charging him with the murder of Dink Broughton on April 19, 1910. The venue of the case was properly changed from Eastland to Taylor County in which latter county the appellant was tried in September, 1910, convicted of murder in the second degree, and given twenty-five years confinement in the penitentiary.

We will not state the evidence extensively, but instead, will state the conclusions therefrom which were clearly authorized by the evidence. The appellant and deceased were farmers, living about a half mile apart at the time of the killing, and each had lived at their respective places for some years continuously prior to the killing. On the night of April 19, 1910, about midnight, the appellant, armed with a shotgun, went to the house of the deceased where he was asleep, and upon his going out of the house in response to appellant's call, appellant shot and killed him. The appellant at once left, went to his brother's some miles away and told him what he had done, and wanted his brother to arm himself and assist him in resisting an arrest by the officers. The officers, early next morning, appeared on the ground of the deceased and appellant and hunted for appellant. Appellant not only fled, but resisted arrest, assisted by his son, both being armed with guns and fired at the officers and the posse attempting to arrest him as long as they had ammunition. The officers and the posse shooting at him many times. He shot and wounded—not seriously—one of the officers' posse. Finally, about midnight, the night after the killing, the officers succeeded in overpowering and arresting the appellant. The appellant, on the trial of the case, himself, had the sheriff and some of his deputies and the constable and others of the posse making the arrest, and the sheriff of Taylor County, where the case was removed upon change of venue, each and all to testify that after the arrest, appellant stated to each of them in effect that he had shot the deceased at the time charged. This evidence introduced by appellant was for

the purpose of showing what the appellant said in connection with the statement that he had killed the deceased, as tending to show his insanity at the time of the killing and their evidence had more or less tendency to show this. Notwithstanding, appellant, in his brief, claims that it was not clearly shown, except by circumstances, that appellant killed the deceased, as charged, yet, from all the evidence, and the manner in which the trial was conducted, it sems to have been practically and actually conceded by appellant on the trial that he had done the killing and the evidence altogether, we think, clearly shows this by both the witnesses for the State and for the defendant.

Appellant's principal, if not his only, defense was his claimed insanity at the time of the killing. The appellant not only claimed that he was insane then, but had been, in effect, continuously for, at least, if not more than sixteen years prior to the killing, and among other things, showed that he had been properly convicted of lunacy in August, 1901, in the County Court of Eastland County, Texas, and was then confined in one of the State lunatic asylums for some one or two years under that conviction, but he was released therefrom and had been out of the insane asylum for some seven to eight years since his incarceration therein under said conviction of lunacy.

The appellant introduced much testimony and by many non-expert witnesses, of the conduct, acts and sayings of the appellant that tended more or less strongly to show that his claim of insanity for the whole period claimed by him was true and he introduced the testimony of legal experts, doctors, whose opinions were that appellant was insane, and their testimony tended also to show that he was insane during the whole period claimed by appellant and even up to the time of the trial just prior to their giving their testimony.

The State introduced much non-expert testimony on the same subject, which tended to show that while the appellant was eccentric, quiet, and reticent, he was not insane at the time of the killing and at other periods and probably the whole of the period of the time that appellant claimed that he was insane. From all the testimony, we are of the opinion that the jury could properly find and were justified in finding that the appellant was not insane at the time of the killing to such an extent as to prevent his conviction in this case, and to justify their verdict of guilty.

The record is quite voluminous, there being nearly four hundred pages of typewritten matter therein. The appellant has some fifty bills of exception and more than seventy-five grounds in his motions for new trial, including in the motions, separate grounds for each separate bill of exceptions. The bills of exception are to the admission mostly—in a few instances, of the exclusion—of evidence. The other grounds of the motion for new trial are attacks upon the charge of the court. In his attacks upon the charge of the court, practically, if not actually, every paragraph, and in some instances, some sentences, of the charge are attacked. Besides an able and vigorous oral argument by appel-

lant's attorneys on the submission of the case, they have filed an able, forcible, and full written brief in the case.

It will be unnecessary for us to take up in detail and discuss either the various bills of exception, or the attacks on the charge of the court as it would serve no useful purpose in this case or any other, to do so. The appellant's several attacks on the charge of the court are based, to some considerable extent, on the dissenting opinion of Judge Hurt in the case of King v. State, 9 Texas Crim. App., 515, and he cites some authorities outside of the State and among them, one U. S. Supreme Court decision, which takes the same view of the legal presumption of the sanity of an accused as Judge Hurt did in the King case; but this court, uniformly, not only in the King case, but in cases prior thereto and in every case since, where the question has been raised, has held the reverse, expressly, of what Judge Hurt, in his dissenting opinion, held in that case, and we approve the decisions to that effect.

In some grounds of appellant's motion for new trial, he attacks the charge of the court on murder in the first degree. He seems not to present them in his brief in this case. We have examined the charge of the court on that subject and it is strictly in accordance with the statute and decisions of this State, and it was necessary and proper that it should be given, but even if there had been some error in it, as appellant was convicted only of murder in the second degree, any error in the charge of the court on murder in the first degree would not cause a reversal.

Most, if not all, of the other attacks on the charge of the court are upon different sentences and paragraphs of the charge of the court on the subject of insanity. As stated by appellant, this charge contains six typewritten pages. It is unnecessary for us to copy it or any portion of it. We have gone over it time and again and have compared it with the charge on that subject in the case of King v. State, 9 Texas Crim. App., 515, in which is laid down and approved by this court, what is denominated the "elaborate" form of charge on insanity, and with the charge of the court in Hunt v. State, 33 Texas Crim. Rep., 252, on the subject of the legal effect to be given to the County Court conviction of the appellant of insanity and the judgment therein; and to that feature of the charge on insanity which is denominated by the authorities as "irresistible impulse," which are held proper in Cannon v. State, 41 Texas Crim. Rep., 467; Thomas v. State, 55 Texas Crim. Rep., 293; Lowe v. State, 44 Texas Crim. Rep., 224; Harrison v. State, 44 Texas Crim. Rep., 164; Nelson v. State, 43 Texas Crim. Rep., 551; Hurst v. State, 40 Texas Crim. Rep., 378, and other cases unnecessary to cite, and find that the learned judge who tried this case copied almost literally these charges on this subject which have been, without any exception, approved by this court as correct charges on insanity. The only variations from them in the charge in this case is in appellant's favor, where in one or two instances, the charges in the cases cited have not specifically said that the jury should believe such

and such a fact "beyond a reasonable doubt," the court, in his charge in this case, has therein "beyond a reasonable doubt," which is all in favor of the appellant and in no sense against him. So that, in our opinion, the charge of the court is not subject to any or either of the attacks made upon it by the appellant, but it is the charge that should have been given in this case.

We desire to state that a careful going over of the record in this case has convinced us that it was tried with a great deal of care and attention by the learned presiding judge, and with ability and cleverness by the attorneys, both for the appellant and the State.

As stated above, both sides introduced many non-expert witnesses on the subject of the insanity of the appellant. The method of introducing these witnesses by both the appellant and the State, seems to have been in this way: Whichever side introduced a non-expert witness on the subject, would proceed by the direct examination to show who the witness was, what his business and occupation was, where he lived, how near to the appellant and the length of time, the opportunity of seeing, being with and knowing the appellant, his acts, conversations and talk in whatever he had done and wherever they had seen or been with him for the number of years and the times they are shown to have been with him. Some of these witnesses were farmers who had lived from a few hundred yards of the appellant to within a few miles of him; we believe, none of them less than two years and from that up to as many as fifteen to twenty years. Some of them were the merchants with whom he traded many times and many years, detailing more or less the course of dealing, particular deals and such like. One was the rural U. S. mail agent, who, for five years continuously, had the appellant on his route and with whom he had had many transactions of delivering mail to him and appellant purchasing post-office orders from him and matters as would ordinarily occur between such parties on such occasions; some of them being at church with him many times in the course of years, at school meetings with him in the same way, and working the road with him as one of the hands, many times for several years, the conduct of his farming interests and numerous other business and social transactions with him, in all of which matters there were more or less conversations between the parties and the witnesses' means of observation were, in effect, more or less detailed.

Then the witness would be turned over to the other side for cross-examination, which was generally done over the same grounds, sometimes drawing out more of the details of the several matters than had been drawn out on direct examination and then the witness would be turned back to the parties introducing him, who would ask the witness, in substance, the question, from all these years of acquaintance with the appellant, from the observations the witness had made from time to time of his acts and from the times he had been in his company and from all the facts and circumstances that had come within his knowledge and observation, his opinion as to whether or not he was

sane or insane, and whether or not he knew right from wrong and whether or not he knew the act he was doing with which he is charged in the case, was right or wrong and the witness would then answer that in his opinion he was sane or insane, or he knew right from wrong, or did not know it as the case might be. Most of the time appellant would object to the witness for the State giving his opinion as to the sanity or insanity or knowledge of right and wrong by the appellant, but did not do so in all instances. As the testimony of T. L. Barton, a witness in behalf of the appellant is short, we will give the whole of it as follows: "My name is T. L. Barton. I am commonly known as Tom Barton. I live at Wheat Springs in Eastland County. I live a quarter of a mile from Marshall Jordan. I have lived close to him a little over eighteen months. I never seen Marshall Jordan around his cattle with a gun, but I have seen him with his gun. He was just walking over his place with his gun is all I ever seen him with his gun. I never did observe any peculiarities in his conduct with reference to the times when he has been around his cattle. I never did see him climbing trees or anything of that sort."

Cross-examination: "I live within about a quarter of a mile of the defendant. I have lived close to him a little over eighteen months. He carried his place on as good as I did mine. I have never been charged with insanity. I have talked with him; sometimes I have talked with him every few days. Mine and his farms joined, and we plowed up often and talk across the fence and swap tales. I talked to him generally about the neighborhood news, and things that farmers generally talk about. He would always talk intelligently to me. In my opinion, he knew right from wrong. I never seen him any other way. In my opinion, he would know it was wrong to kill a man. I never seen him when he was in that shape. I am pretty sure he would know it was wrong to kill a man. He generally kept his hair and his beard cut off. He kept his moustache. He had some chin beard. I never did see him wearing his hair and beard like he is wearing it now."

It is unnecessary for us to give the substance of but one of appellant's bills on this subject. It is as to the State's witness, Hill Guy. The court, however, in allowing the bill, qualified it as follows: "The first paragraph of the bill is incorrect where it states that all of the evidence of witness was introduced over the objection of defendant. The defendant did not object to any part of said testimony, except the non-expert opinion as to insanity, and the court only permitted said witness to testify as a *non-expert,* and as a predicate for same, reference is hereby made to all of said testimony of said Hill Guy, in statement of facts, which is made a part hereof, as bill is incomplete." This bill, as thus allowed and qualified by the court, is wholly insufficient. This court does not have to go to the statement of facts to hunt up, in considering bills, what the testimony of the witness was. This must be shown by the bill itself. Burt v. State, 38 Texas Crim. Rep., 397.

Many other cases might be cited, but this has been the uniform holding of this court at all times.

Each of appellant's other bills of exception on this subject in most instances, if not all of them, are more defective than this one and were likewise qualified and explained by the judge, in allowing them, substantially as was done in this case, especially in referring to the statement of facts for the testimony of the witness in full, as it had not been stated sufficiently full in the bill itself.

However, as an illustration of this and all the others, we will here give substantially the testimony of this witness and the manner of his direct and cross-examination. We will not give in full his testimony, but sufficient of it to show in substance the testimony on the point. He testified he was a farmer as was the appellant; they lived in the same community, not over three-fourths of a mile apart. He knew the appellant and had known him from thirteen to fifteen years before the killing. Saw him most every week during all these years; sometimes he might not see him in two weeks; often he would see him several times a week. During these twelve or fifteen years he did not see him at all while he was in the insane asylum under the conviction of the Eastland County Court case. Appellant was living at the same place all this time and was there when the witness moved to that community. He met him at church a number of times; met him at country gatherings where those in the community would meet to work the roads and that sort of things. Saw him and worked with him on the roads for many years during this time, as often as twice a year. Sometimes he would see him nearly every day; at other times there would be an interval of two weeks when he would not see him. During these years he had business dealings with him and went to see him on business; went to see him one time in regard to helping build a school-house in the community. He seemed to be distant with his neighbors; he did not mix and mingle with them much during this whole time. The witness had observed him in conversation with other people occasionally when they would be working on the road. Witness traded at the town of Gorman most all this time and had to pass appellant's house in going to and from this town. He had been with him at the gins where they were both having cotton ginned during this time. Probably saw him only twice at the gin five or six years before the trial. When they were working the roads together he was in company with him as much as he was with the other people, that is, as much as his distant way would permit; he came in contact with him in such a manner that he had an opportunity to observe his peculiarities. Heard him, while they were working the roads, make expressions and things of that kind and they were frequently right together.

On cross-examination, by defendant. Appellant did not associate or mix with his neighbors particularly. He was not at the witness' house but one time that he remembered. They did not "neighbor." The

witness had made thirteen crops on the place he lived on, during these years, while the appellant lived at his place. The appellant missed making a crop one year, the year he was in the asylum. The witness had been about the appellant's house and in his field when he was at work at least three times, but never was in his house. On these occasions, when he was at his house, he was there on business with the appellant and had a short conversation with him each time, one time the conversation with him was three-fourths of an hour or a half hour. The other conversations at the time he was at his house were of ten, fifteen or twenty minutes duration. Appellant had his cotton ginned, two years before the killing, at Winters' gin, at or near Gorman; the appellant hauled his cotton down there three or four years before the trial. On one occasion the witness overtook the appellant going from the gin and asked him what kind of a turnout he got from his cotton. The appellant was grumbling about the kind of turnout he got at the other gin and said he would try Winters' gin and see what kind of turnout he got there; they talked about the turnout of cotton. At one time when he went to appellant's house about five years before the trial, he went there to solicit him about the school-house. The witness recalled that the last conversation he had with the appellant about the school business was about two years before the trial. Since then he met him on the road and they spoke. The witness remembered that the conversations he had with him on the road were just talking and passing words, passing a few words as he would with any other. The witness could not recall that the appellant had ever been in the witness' yard but one time and that was to buy some potatoes, but the witness was not at home on that occasion; he could not remember having a conversation with him at church; he just saw him and he was rather off to himself, talking to nobody and saying nothing to anybody. He had four conversations with him at the school-house; by conversations he means, like he would sit down and talk with a man. Then he talked with him one time when he came from the gin. On this occasion they talked about the turnout of the cotton and drove along three or four miles together in this conversation.

On cross-examination by the court. The witness had seen the appellant very frequently during the last year prior to the killing. Appellant lived on witness' road to town. Sometimes he would see him every day for a week maybe and see him three or four times during that time. Appellant would be about his place and out in the field at work and the witness pass along the road. The road was along appellant's field. Sometimes he would meet him at one place and sometimes at another; sometimes he would be over in the field at work. The witness had a great many occasions to go by appellant's and sometimes he would see him every day in the week. The appellant's house was not right on the road, but his field was.

On redirect examination by the State. The appellant conducted his farm about as well as the most of farmers; he was successful. Saw

him working a number of times. He conducted and managed his farm as well as the average farmer, if not above the average. The three-fourths of an hour conversation which the witness related that he had with the appellant was after the appellant came back from the asylum.

Then in answer to the State's question, the witness stated: "From my thirteen years' acquaintance with this man and from the observation I have made from time to time of his acts and the times I have been in his company and from all the facts and circumstances that have come within my knowledge and observation, in my opinion I would have to say that he is a sane man to the best of my knowledge. In my opinion he knew right from wrong. I believe he knew the nature and quality of the act he was doing and that he ought not to do it." The appellant's only objections to this last testimony of the witness, in quotations above, were these: "Because it affirmatively appeared that said witness did not have adequate means of observation; it affirmatively appeared that said witness had not had an opportunity to form an accurate judgment as to the existence of insanity, considered with reference to its supposed character or degree, and because it further affirmatively appeared that the said witness had not had such intimate relations with the defendant as to render his opinion as to the sanity or insanity of defendant admissible, and because it affirmatively appeared that the opinion of said witness was not predicated upon facts, coming within the observation of said witness and because it affirmatively appeared that said witness was not an expert on insanity." The court overruled these objections and admitted the said testimony objected to, and in allowing appellant's bill, qualified it as shown above.

It will be seen that the appellant did not object to this testimony because the witness did not detail the several conversations he had with the appellant, nor go into more detail in describing the conduct of the appellant and his appearance, conduct, etc. The only objections are those quoted above.

It will also be seen that the State did not ask the witness' opinion of the sanity or insanity, etc., of the appellant until after the appellant had had the opportunity to thoroughly cross the witness as to all of the matters about which he testified and had so thoroughly crossed him.

As we understand, practically all, if not all, of the authorities now, both text-books and courts, hold that non-expert witnesses, when they are shown to have had a sufficient knowledge of the accused for a sufficient length of time, and come in contact with him and have had conversations and business relations with him for any considerable period of time, based solely on their own knowledge and observation, they can express an opinion as to the sanity or insanity of the accused. The Supreme Court of the United States, in discussing this question in the case of Conn. Mut. Life Ins. Co. v. Lathrop, 111 U. S., 536, says:

"Counsel for the plaintiff in error, contends that witnesses who are not experts in medical science may not, under any circumstances, ex-

press their judgment as to the sane or insane state of a person's mind. This position, it must be conceded, finds support in some adjudged cases as well as in some elementary treatises on evidence. But, in our opinion, it can not be sustained consistently with the weight of authority, nor without closing an important avenue of truth in many, if not in every case, civil and criminal, which involves the question of insanity. Whether an individual is insane, is not always best solved by abstruse metaphysical speculations, expressed in the technical language of medical science. The common sense and we may add, the natural instincts of mankind, reject the supposition that only experts can approximate certainty upon such a subject. There are matters of which all men have more or less knowledge, according to their mental capacity and habits of observation; matters about which they may and do form opinions, sufficiently satisfactory to constitute the basis of action. While the *mere* opinion of a non-professional witness, predicated upon facts detailed by others, is incompetent as evidence upon an issue of insanity, his judgment, based upon personal knowledge of the circumstances involved in such an inquiry, certainly is of value; because the natural and ordinary operations of the human intellect and the appearance and conduct of insane persons, as contrasted with the appearance and conduct of persons of sound mind, are more or less understood and recognized by everyone of ordinary intelligence who comes in contact with his species. The extent to which such opinions should influence or control the judgment of the court or jury must depend upon the intelligence of the witness, as manifested by his examination, and upon his opportunities to ascertain all the circumstances that should properly affect any conclusion reached. It will also depend, in part, upon the degree of the mental unsoundness of the person whose condition is the subject of inquiry; for his derangement may be so total and palpable that but slight observation is necessary to enable persons of ordinary understanding to form a reasonably accurate judgment as to his sanity or insanity; in other cases, the symptoms may be of such an occult character as to require the closest scrutiny and the highest skill to detect the existence of insanity.

"The truth is, the statement of a non-professional witness as to the sanity or insanity, at a particular time, of an individual, whose appearance, manner, habits and conduct came under his personal observation, is not the expression of mere opinion. In form, it is opinion, because it expresses an inference or conclusion based upon observation of the appearance, manner and motions of another person, of which a correct idea can not well be communicated in words to others, without embodying, more or less, the impressions or judgment of the witness. But, in a substantial sense and for every purpose essential to a safe conclusion, the mental condition of an individual, as sane or insane, is a fact, and the expressed opinion of one who has had adequate opportunities to observe his conduct and appearance is but the statement of a fact; not, indeed, a fact established by direct and positive proof,

because in most, if not all cases, it is impossible to determine, with absolute certainty, the precise mental condition of another; yet, being founded on actual observation and being consistent with common experience and the ordinary manifestations of the condition of the mind, it is knowledge, so far as the human intellect can acquire knowledge upon such subjects. Insanity is a disease of the mind, which assumes as many and various forms as there are shades of difference in the human character. It is, as has been well said, a condition which impresses itself as an aggregate on the observer, and the opinion of one, personally cognizant of the minute circumstances making up that aggregate and which are detailed in connection with such opinion, is, in its essence, only fact 'at short hand.' 1 Wharton & Stille's Med. Juris., sec. 257. This species of evidence should be admitted, not only because of its intrinsic value, when the result of observation by persons of intelligence, but from necessity. We say from necessity, because a jury or court, having had no opportunity for personal observation, would otherwise be deprived of the knowledge which others possess; but also, because, if the witness may be permitted to state, as, undoubtedly, he would be, where his opportunities of observation have been adequate, 'that he has known the individual for many years; has repeatedly conversed with him and heard others converse with him; that the witness had noticed in these conversations he was incoherent and silly; that in his habits he was occasionally highly pleased and greatly vexed without a cause; and that, in his conduct, he was wild, irrational, extravagant and crazy, what would this be to declare the judgment or opinion of the witness of what is incoherent or foolish in conversation, what reasonable cause of pleasure or resentment, and what the *indicia* of sound or disordered intellect? If he may not so testify, but must give the supposed silly and incoherent language, state the degrees and all the accompanying circumstances of highly excited emotion and specifically set forth the freaks or acts regarded as irrational, and thus without the least intimation of any opinion which he has formed of their character, where are such witnesses to be found? Can it be supposed that those, not having a special interest in the subject, shall have so charged their memories with these matters, as distinct, independent facts, as to be able to present them in their entirety and simplicity to the jury? Or, if such a witness be found, can he conceal from the jury the *impression,* which has been made upon his mind, and when this is collected, can it be doubted, but that his judgment has been influenced by many, very many, circumstances which he has not communicated, which he can not communicate, and of which he himself is not aware?' Clary v. Clary, 2 Ired. Law, 78. The jury, being informed as to the witness' opportunities to know all the circumstances, and of the reasons upon which he rests his statement as to the ultimate general fact of sanity or insanity, are able to test the accuracy or soundness of the opinion expressed, and thus, by using the ordinary means for the ascertainment of truth, reach the ends of substantial justice.

"These views are sustained by a very large number of adjudications in the courts of this country, some of which are cited in the margin." Citing a great many decisions and text-books sustaining the court.

The Supreme Court of this State in Holcomb v. State, 41 Texas, 125, in an opinion by Judge Gould, says: "The appellant was indicted and convicted of theft from a house, the main defense being his insanity or want of mental capacity.

"The court refused to permit witnesses who testified to conduct of defendant, tending to show his mental deficiency, and who, from the length of time they had known defendant, would appear to have had good opportunities of forming an opinion, to give their conclusions or opinions as to his mental soundness.

"In this we think there was error. The law is believed to be well settled that non-professional witnesses should be allowed to state their opinion as to the sanity of a party, as the result of their observation, accompanied with a statement of the facts observed. (2 Ired., 78; 25 Ala., 21; 1 Greenl. Ev., sec. 440, note 4; 2 Bish. Crim. Proc., secs. 676-680)." And the Supreme Court of this State, in Scalf v. Collin County, 80 Texas, 514, quotes and approves the decision in the Holcomb case above. There are a great many cases decided by this court, among them, Williams v. State, 37 Texas Crim. Rep., 348; Henderson v. State, 49 Texas Crim. Rep., 511; Hurst v. State, 40 Texas Crim. Rep., 378, 40 S. W. Rep., 264, and others unnecessary to cite, adhering to and elaborating this doctrine.

It is true that in some other cases by this court such testimony has been held inadmissible when it was shown by their testimony that the witness had not had sufficient acquaintance with, for a sufficient length of time and had not observed the conduct, and conversations of the accused and had not had conversations and transactions with him sufficient to show that they had a basis for an opinion, such as Burton v. State, 51 Texas Crim. Rep., 196; Wells v. State, 50 Texas Crim. Rep., 499; Simms v. State, 50 Texas Crim. Rep., 563, and other cases, but in all the cases the objections of the appellant to the testimony raised the specific question by proper objections at the time.

As noticed above in this case, none of the appellant's objections went to the point that the several witnesses had not detailed the several conversations, transactions, etc., etc., had with the witnesses. If such had been deemed proper or necessary in the lower court and the objections had been made therein, then in some of the instances, while the witnesses were testifying in this case, doubtless, the State would have met the objections by the proper testimony at the time. But as the appellant in this case had had the opportunity, and exercised it, of crossing the witnesses on these several matters and frequently brought out what of the conversations, transactions, etc., the witness had had with the appellant, there was no reversible error in permitting the witness to testify as was done in this instance.

The course pursued with the witness, Guy, above given, except the

judge did not cross-examine, was substantially pursued as to every other witness introduced by the State, and substantially the same course was pursued by the appellant in the introduction, examination and opinion of the witness in every instance offered by him. In other words, both the State and the appellant, in the introduction and qualification of their witnesses, and the opinion obtained from them, was under substantially the same course of proceeding and doubtless each, at the time, did not deem it necessary to further go into the particularities of each transaction and each conversation, but were satisfied with and deemed what they did do sufficient on the point.

Appellant, in his brief, presents the question of the admissibility in this case of this character of evidence one time only and groups all of the others without taking up each separately. We have deemed it unnecessary to take up each separately, as there is not sufficient difference between any of them to require this and it practically seems to be so conceded by appellant.

We have disposed, therefore, of all questions that have been presented by appellant's brief. There are other grounds of the motion for new trial and some other minor questions presented by bills of exception which we deem unnecessary to take up and discuss severally. We have, however, considered and investigated each one, and in our opinion, neither of them shows any reversible error.

We regard the evidence as amply sufficient to sustain the verdict as we also regard it amply sufficient to have sustained the acquittal of the appellant on the ground of insanity. Under such circumstances, we feel that we have neither the right nor the authority to disturb the verdict.

There being no reversible error pointed out, the judgment will be affirmed.

*Affirmed.*

### ON REHEARING.

#### December 20, 1911.

PRENDERGAST, JUDGE.—After the style of the case and this court, identifying it, and the signature of attorneys for the appellant, the following is in full, the motion for rehearing:

"Now comes the appellant, Marshall Jordan, and moves the court to set aside the judgment of this court, rendered in this cause, on Nov. 1st, 1911, affirming this case, and to grant him a rehearing, and upon final hearing hereof, to reverse and remand this cause.

"The ground, upon which the appellant seeks a reversal of this cause, is set forth, in a brief, which will be filed in this court, within a short time, and to the said brief, the appellant most respectfully invites the attention of the court."

The court is unanimously of the opinion that this is too general to point out and call to their attention any supposed error which we can pass upon. It is universally the practice established and followed by this court that complaints made in the briefs of appellants, or in as-

signments that are not based upon a specific ground pointed out properly in the court below in the case of a motion for new trial, or for rehearing in this court, that this court can not consider them. This motion for rehearing was filed herein on November 16, 1911, the last day that a motion for rehearing could be filed herein. The briefs on this motion were not filed until December 13, 1911. No leave of the court was asked or granted to amend the motion for rehearing. There is, therefore, nothing pointed out by the motion for rehearing which this court can consider.

It will, therefore, be overruled.

*Overruled.*