## WILLIAM F. BENSON v. THE STATE.

No. 1692. Decided December 22, 1897.

**1. Continuance—Diligence.**

Where a defendant, who was in jail when the indictment was returned on the 9th of September, did not apply for process until the 23d, and the process was not issued until the 24th of September, and was delivered by his counsel to an officer of another county on the 25th, with only four days for service before the day set for trial, which was the 28th, and no excuse is shown for the delay; Held, proper diligence for a continuance is not shown.

**2. Same—Practice on Appeal.**

Where, on an inspection of the record on appeal, it appears that an absent witness would not, if present, have sworn to the facts set out in an application for continuance, or if he should so testify, that his testimony, in the light of the evidence adduced, would not be probably true; or, where it is manifest that the proposed absent witness is a myth, it will be Held, that the continuance was properly refused.

**3. Same—Witnesses to Prove Character.**

A continuance will not be granted for witnesses to prove good character, except under rare and peculiar circumstances.

**4. Murder—Dying Declarations—Predicate.**

On a trial for murder, where it was made to appear that deceased was rational and that he believed that he was soon about to die, testimony as to his conduct and remarks made by him within fifteen or twenty minutes after he had received the fatal wound, was admissible for the purpose of laying the predicate for the introduction of his dying declarations. Said dying declarations were also admissible as res gestae.

**5. Evidence as to Contradictory Statements of a Witness—Charge.**

Where the court instructed the jury: "The State has introduced evidence to show that the witness J. made to the witness C. statements different from his statements on the stand as a witness, as to where he was at the time of the shooting. This testimony of the witness C. is not to be considered as tending to show the truth of the facts, sought by him, to have been stated by the witness J., but is to be considered as affecting the credibility of the said witness J., or the weight to be attached to his testimony, if considered by you at all." Held, correct in every particular except that portion which intimates that the jury might not consider the testimony of C., but this was favorable to the defendant.

APPEAL from the District Court of Fort Bend. Tried below before Hon. T. S. REESE.

Appeal from a conviction of murder in the first degree, the penalty being assessed at death.

The indictment charged appellant with the murder of George Canady, by shooting him with a pistol, on the 3d day of May, 1897.

Briefly stated, the facts attendant upon the killing are that Canady, the deceased, was a farmer who had resided for several years near Simon-

ton Switch, a railroad station in Fort Bend County; in fact, his residence was about 100 yards from the storehouse of Warren & Son, at "the Switch."

William F. Benson, the defendant, was a new comer in the neighborhood, he having removed from Robertson County some six months before. It also appeared that there were three or four other new comers who had recently settled in that neighborhood. On the evening before the shooting it was reported to Benson, the defendant, that the deceased, Canady, had said, in substance, that he was going to leave and give the country up to the damned yahoos; and that he had called the defendant "a God-damned yahoo." On Sunday evening, on the 2d of May, 1894, just before the shooting, Benson, the defendant, and several other parties were in the storehouse of Warren & Son. Canady, who it seems had been off in the country with his family, returned with them in a two-horse wagon, passing by the store to his house, where he left Mrs. Canady and children, save one, a boy. He got back into the wagon and he and the little boy came back to the store of Warren & Son, Canady, it seems having brought the wagon back to get a family of negroes and their effects that had come up that day on the railroad to the switch, Canady having hired the negroes to work on his place during the year. As Canady was driving by the Warren storehouse, going to the station, he and his little boy sitting on the spring seat of the wagon, the defendant Benson emerged from Warren's store, called to Canady to stop, and went out to the wagon. He told Canady that he had heard that he had called him a "yahoo," or "a God-damned yahoo," and that he must take it back. Canady told him that he had always treated him nicely, and said, "If I have done anything to hurt your feelings, I beg your pardon, and that is all I can do." Another witness stated that he heard Mr. Canady say to defendant, "If the shoe pinches, let it pinch; but if I have said anything to hurt your feelings, I beg your pardon." Benson then said, "If you don't take it back I will shoot you," and he pulled a pistol and pointed it at Canady, and said, "I will give you just a minute to take it back," and lowered the pistol. Mr. Canady again stated that he could not take it back, but if he had hurt Mr. Benson's feelings, and he held his right hand in front of him, when Benson shot him four times and the pistol snapped twice. There were other remarks made by the parties, which the witnesses did not remember so as to state them. The defendant's witnesses testified that just before the shooting the deceased jumped up from the wagon seat, facing the defendant, and said, "Here's at you." And defendant, himself, testifying to the same facts, said: "He jumped up and said, 'Here's at you, God damn you,' and threw his hand behind him, and I told him to take it back or I would shoot him—take his hand back, or I would shoot him—and I pulled my pistol and shot him. The reason I shot him was that I thought he was going to draw a gun to shoot me."

The State, in rebuttal to the above testimony of the defendant, introduced L. F. Moran, who testified: "I was at Simonton a short time after the defendant shot the deceased, and had a conversation with defendant, and asked him what was the cause of the shooting, and he replied, that he told deceased to take it back, and he would not do it, and he shot him."

Cross-examined by defendant, he said: "He did not say what he told deceased to take back. Defendant just told me the words that I have given. He said it two or three times while I was there, and each time he repeated, 'I told him to take it back and he would not, and I shot him.' "

After deceased was shot he got out of the wagon and was carried immediately to his house which, as above stated, was not over 100 yards distant.

The following is the testimony relating to deceased's dying declarations, made after he reached the house.

Cora Canady testified: "I heard my father say to my mother, 'Prepare for the worst; for the end will come, and come soon.' I was in and out of the room all the time after my father was brought home, until he died in the morning. This was the only statement I heard him make after he was brought home. This statement was made as soon as he was brought home."

Mrs. George Canady testified as follows: "At the time of the difficulty I was in my back yard, feeding my chickens. I heard the shot, and ran out to the front gate and saw my husband get out of the wagon and walk towards the platform. They brought my husband home about five minutes afterwards, and he stated to me, 'Prepare for the worst, for it will come soon.' This was all the statement my husband made to me, and it was made as soon as he was brought home."

A. B. McGee testified as follows: "I got to the house when the deceased was taken home, and found deceased lying upon the bed. The deceased said to me, 'This is quite a change.' I said to him, 'Yes.' Deceased said to me, 'I want to urinate.' I told him to wait until the doctor came, and perhaps he could relieve him. Deceased said, 'I will never urinate on earth again.' The deceased called my attention to the blood gurgling in his lungs. The deceased asked me and Ben Swisher to take care of his crop, and do for them just as he would do by our own. This was a few minutes after the deceased was brought home."

Ben Swisher testified as follows: "A short time after deceased was brought home he told his family, in my presence, that they 'could prepare for the worst, for the end would come, and come soon.' A little while after this, just before dark, he told me that he wanted me to stay with his family this summer. He told me he was not going to live, and asked me to stay and see after his crops."

George Cone testified: "I was at Mr. George Canaday's a short time after he was shot. I heard him tell Mr. McGee that he wanted to urinate, and, in reply to something that McGee said to him, deceased said that he 'would never urinate again on earth.' "

J. F. Canady testified as follows: "Deceased was lying upon the bed, and I heard him say to Mr. McGee, 'I want to urinate.' Mr. McGee told him to wait until the doctor came, and the doctor might relieve him. The deceased said, 'I will never urinate upon earth again.' Also, he told his wife to 'prepare for the worst, the end would come, and come soon.'"

The foregoing testimony was the predicate upon which the dying declaration, as testified to by J. F. Canady, was predicated, which dying declaration was as follows:

"I was driving along in my wagon, when the defendant came out and called to me, 'Mr. Canady, I understand you have called me a God-damned yahoo last night, and I want to know if you made such a remark, and if you did, you have got to take it back;' and I replied, saying, 'If I made such a statement, and the shoe pinches, I am willing to apologize.' Benson said, 'If you made that statement, you have got to take it back.' I told him, 'I can not take my words back, because words when spoken can not be taken back, but I will apologize to you if I have hurt your feelings.' Benson said to me, 'If you do not take it back, I will shoot you,' and he pulled his pistol on me. I told him again I would apologize if I had hurt his feelings. Then, without a word, he began shooting me. The poor fellow was so ignorant, that he did not know what an apology meant."

All of which testimony the defendant objected to, which objections were overruled and exceptions taken to.

The matters pertaining to the defendant's application for a continuance are sufficiently stated in the opinion, and no additional statement is required.

*Bryant & Montague*, for appellant.

*Wharton & Woody* and *Mann Trice*, Assistant Attorney-General, for the State.

HURT, PRESIDING JUDGE.—Appellant was tried and convicted of murder in the first degree, for killing George Canady, and his punishment assessed at death.

Appellant submitted a motion to quash the indictment. We have repeatedly passed upon a similar indictment to the one presented in this case, and held it sufficient. See Caldwell v. State, 28 Texas Crim. App., 566, and cases there cited.

A motion was made to quash the special venire. The explanation of the trial judge and affidavits of the clerk show that the motion was not well taken. The statute pertaining to this subject was complied with, and is as follows: "Whenever a special venire is ordered, all the names of all the persons selected by the jury commissioners to do jury service for the term at which such special venire is required shall be placed upon tickets of similar size and color of paper, and the tickets placed in a box and well shaken up, and from this box, the clerk in the presence of the judge in

open court, shall draw a number of names required for such special venire, and shall prepare a list of such names in the order in which they are drawn from the box, and attach such list to the writ and deliver the same to the sheriff." Code Crim. Proc. 1895, art. 647. All of these things were done by the clerk, as shown by his affidavits. The motion to quash the service of the special venire is not well taken. It is not insisted that the names of the parties summoned to serve as special veniremen were not served upon the appellant. A certified copy of the writ, as well as the names of the persons summoned, were served on appellant. There is nothing in this motion worthy of our consideration.

Appellant presented a motion to continue the case, for the want of the testimony of one Henry Hughes. There is no diligence shown as to this witness. The indictment was returned on the 9th of September, 1897. The defendant was then in custody. Process was not applied for to the district clerk of Fort Bend County until the 23d of September, and was not issued by him until the 24th of September. It appears that said process was mailed to J. D. Bryant, of counsel for defendant, at Houston, Texas, who did not deliver the same to an officer until the 25th of September; so that the officer only had four days within which to serve said witness before the day of trial—the 28th of September. Diligence would have required appellant to have issued his process as early after the 9th of September as possible; but no excuse is shown here for the delay. For aught that appears, the witness in the meantime may have left Harris County, although he was a resident of said county. Concede, however, that the diligence was sufficient as to this witness; we are inclined to believe, on examining the record, that, if he were present, he would not testify to the facts stated in the application. But even if he did so testify, in the light of the testimony, we could not regard the facts expected to be proved by him probably true. Again, the inquiry was made from a number of witnesses as to the presence of this absent witness at the homicide, and no one, either for the State or the defendant, intimates that he was present or was known in that community. In fact, he was never heard of by any witness on the stand, either as a stranger, or by name, as being present or in that county. We are of opinion that he was evidently a myth.

As to the witnesses resident in Robertson County, we make the same observations in regard to the diligence used for them as heretofore in reference to the witness Hughes. Besides, these witnesses were character witnesses, and a continuance will not be granted for this character of testimony except under peculiar circumstances. Appellant, however, introduced testimony as to his good character, which was not controverted at all.

The State introduced Cora Canady, Mrs. George, Canady A. B. McGee, Ben Swisher, George Cone, and J. F. Canady, who testified to the conduct and remarks of the deceased soon after he received the mortal wound. This testimony was evidently admissible for the purpose of

laying the predicate for the introduction of the dying declarations of the deceased. Everything stated by each and every witness was pertinent to that subject. By the testimony of these witnesses, it was established beyond any controversy that the deceased was rational, and that he believed he was going to die, and that very soon. This evidence was necessary in order to render admissible the dying declarations of the deceased, which were made within fifteen or twenty minutes after he received the fatal wound. This course of procedure is to be commended.

Appellant objected to the introduction in evidence of the dying declarations of the deceased. The predicate was amply established; that is, that the deceased was rational, and believed he was going to die, and that very soon. Again, under the circumstances of this case, if not dying declarations, his statements were evidently part of the res gestae, and we hold upon both grounds that they were admissible.

Appellant excepted to the following charge of the court to the jury: "The State has introduced evidence to show that the witness George Johnson made to the witness Cone statements different from his statement on the stand as a witness as to where he was at the time of the alleged shooting. This testimony of the witness Cone is not to be considered as tending to show the truth of the facts by him sought to have been stated by the witness Johnson, but is to be considered as affecting the credibility of the said witness Johnson, or the weight to be attached to his testimony, if considered by you at all." Appellant has no ground upon which to complain of this charge. It is correct in every particular,. except that portion which intimates that the jury might not consider the testimony of Cone. This is favorable to the appellant, for it was the duty of the jury to consider Cone's testimony in passing upon the credit to be given to the testimony of Johnson.

The question raised by appellant as to the legality of the term of the court at which this trial occurred has been settled adversely to appellant in the case of Nobles v. State, ante, p. 330.

In motion for new trial, appellant insists that the evidence is not sufficient to sustain the verdict, because of no proof that deceased, Canaday,. is dead. This was a cool, deliberate murder, if the testimony of the witnesses for the State is true. That the deceased died from his wounds is, placed beyond any question. We deem it unnecessary to discuss the testimony.

We are of opinion that the trial below was fair and impartial, the defendant being awarded all his rights. The court instructed the jury in regard to murder in the first degree, murder in the second degree, manslaughter, and self-defense. This, perhaps, was correct, but we are impressed with the opinion that defendant coolly and deliberately intended to kill the deceased if he failed to take back certain remarks he had made;. and if the court had refused to submit manslaughter, or instructed the jury that appellant would be guilty of murder if he intended and did kill deceased, because he did not retract certain statements, we would not have

reversed the judgment because of such instructions. But, as before stated, all the degrees of murder, manslaughter, and self-defense were submitted to the jury, fairly and liberally to the accused. The jury believed the State's theory, convicted appellant of murder in the first degree, assessing his pnuishment at death, and we see no reason for disturbing their finding. The judgment is affirmed.

*Affirmed.*