## ANDREW F. KEY v. THE STATE.

### No. 2715. Decided November 26, 1913.

**1.—Perjury—Evidence Dehors the Record—Transcript in Civil Suit.**

Upon trial of perjury based upon the alleged false testimony in a civil suit for damages in which defendant pleaded defective memory, it was reversible error to allow the jury, over the objections of the defendant, to take with them in their retirement· the transcript of the testimony of defendant in said civil suit, which apart from the questions and answers to and by defendant was not in evidence, and it was manifest that the jury by this method received and considered other evidence than that adduced on the trial of a material character.

**2.—Same—Evidence—Non-expert Testimony.**

Where defendant was indicted for perjury based on his testimony in a damage suit against a certain railway and pleaded defective memory, it was error to exclude the testimony of non-expert witnesses who had intimate acquaintance and dealings with defendant and knowledge of his habits and conduct, not to express an opinion as to his mental condition and what effect it would have on his memory. Following Jordan v. State, 64 Texas Crim. Rep., 187.

**3.—Same—Charge—Theory of Defense.**

Where, upon trial of perjury, defendant pleaded defective memory at the time he made the sworn statement upon which the offense was based, the court should have submitted in an affirmative way said defensive theory.

Appeal from the District Court of Hunt. Tried below before the Hon. Wm. Pierson.

Appeal from a conviction of perjury; penalty, two years imprisonment in the penitentiary.

The opinion states the case.

*E. S. McAlester* and *Sam D. Stinson,* for appellant.—On question of permitting jury to take with them in their retirement the transcript of the testimony and proceedings in the civil suit, only part of which was in evidence: Smith v. State, 42 Texas, 444; McKinney v. State, 48 Texas Crim. Rep., 402; Ferguson v. State, 61 id., 152; Clark v. State, 28 Texas Crim. App., 189; Jackson v. State, 28 id., 370; Warren v. State, 67 Texas Crim. Rep., 273, 149 S. W. Rep., 130; Darter v. State, 39 Texas Crim. Rep., 40; Hargrove v. State, 33 id., 431; Ellis v. State, 33 id., 508; McWilliams v. State, 32 id., 269.

*C. E. Lane,* Assistant Attorney-General, for the State.

HARPER, Judge.—Appellant was prosecuted and convicted of perjury, his punishment being assessed at two years confinement in the State penitentiary.

Appellant had brought suit in the District Court of Hunt County, Texas, against the M., K. & T. Ry. Co. for damages, alleging that he was injured while in the employ of said company. He was duly sworn and testified, in said cause, in substance, as follows: "That he had never been injured in any way from the time he worked for the Katy Railroad at Greenville, in 1907, under Jack Corder, up to April 6, 1912; that he had never collected any money from Gulf, Colorado & Santa Fe, or the Missouri, Kansas & Texas Railroad Company of Texas, or any other railroad for any hurt or injury; that he never had a hernia or rupture before the 6th day of April, 1912; that he had never had any hurting in his left groin or side or been bothered with a knot in his left groin or scrotum prior to April 6, 1912." This testimony so given by him in the civil suit is the basis for the charge of perjury in this case, in the indictment it being alleged that said testimony was false and was negatived as follows: "Whereas in truth and in fact he, Andrew F. Key, had been injured between the time he worked for the Katy Railroad at Greenville, Texas, in 1907, under Jack Corder, and April 6, 1912; and he, the said Andrew F. Key, had collected money from the San Antonio and Aransas Pass Railway Company for an injury in February, 1911; and he, the said Andrew F. Key, had a hernia or rupture before April 6, 1912; and he, the said Andrew F. Key, had had a hurting on his left groin or side and had been bothered with a knot in his left groin or scrotum prior to April 6, 1912, and which said statements so made by said Andrew F. Key as a witness in said case in the manner and form as aforesaid were deliberately and wilfully made, and were deliberately and wilfully false, as he, the said Andrew F. Key, then and there well knew."

The testimony on this trial would support a finding that appellant

did testify as alleged on the trial of the civil suit, and that said statements were false, in fact, the negative allegations being specifically proven by at least two witnesses. However, on this trial, a certified copy of appellant's testimony in the civil suit was used in the examination of appellant, and what he testified on that trial was proven by appellant and other witnesses, and the questions and answers given by appellant on the trial being thus gotten in the record in this case. However, the transcript of the testimony as a whole was never offered nor introduced in evidence on this trial, and if it had been offered it contained matter that was not properly admissible in evidence.

Appellant offered no evidence that he did not testify as stated, and offered no evidence tending to show that such testimony was not false, but all witnesses introduced by him were intended to show that he was mentally defective; that he had no memory as to past transactions. His mother testified as to severe injuries received by him in the head in infancy, and other facts having a tendency to show him a man almost without the faculty of memory. A teacher testified that in his youth appellant came to school in the school where he was teaching for two years; that when he entered school he was in the third grade, and at the end of the two sessions he was still in the third grade, and was in a sense defective in memory. By standard dictionaries "memory" is thus defined: "The mental capacity of retaining unconscious traces of conscious impressions or states, and of recalling these traces to consciousness with the attendant perception that they have a certain relation to the past; in a narrower sense, the power of such retention alone, the power or act of recalling being termed recollection. . . . The power to revive again in our own minds those ideas which after imprinting have disappeared, or have been as it were laid aside out of sight, is memory."

As before stated, the defensive theory, and the sole one relied on, was that appellant on account of accidents received in childhood was defective in memory to the extent that he could not retain and recall past transactions, unless his mind and attention was directed specifically to the act or occasion, and they contend that the evidence on the civil trial was such as to support this theory. That while appellant in answer to general questions had denied he had ever received any prior injury or collected damages therefor, yet when by direct questions his mind and attention was directed to the specific injury, railroad, etc., he then admitted he had received the injury and collected the money as damages for the injury received, and the record discloses that appellant was the only witness introduced on the trial in the civil case, and after his cross-examination, and his attention being thus specifically directed to the matter, on his admissions, the defendant was permitted to and did obtain a judgment against the plaintiff. This being the issue, did the transcript which was delivered to the jury while they were considering the case contain matter not introduced in evidence, which would have a bearing on that issue? We think so. Mr. Carpenter was attorney for plaintiff in the civil suit; he was not a witness on this trial, yet

in the transcript which was delivered to the jury it showed that Mr. Carpenter withdrew from the case, and that the following proceedings had taken place on the trial in the civil case:·

"Plaintiff's counsel: If the court please, this is putting us in a very embarrassing situation. After these questions were propounded to this witness yesterday evening before court adjourned. After court adjourned last night we taken him over to our office—we have two clients a man by the name—and they called and told us this yesterday that they understood he had been ruptured before. And we taken over to the office and asked him, I said, now, Key, if you have been ruptured, if you had a suit with any company or made any settlement, now is the time for you to say so in this office; and I says, 'Now if you go back there and recall your statement they will put you in the pen'; and he said nothing of the kind had ever occurred. I says, 'Now, you know whether you did, and I judge from the way that Mr. McMahon (defendant's counsel) has questioned you that he has something from the Santa Fe or some other railroad that you got this injury or hernia before, and we want you to tell us the truth about it.' And yesterday was the first time I ever talked to him as far as that was concerned; and he has just put up a job on us, that's all there is to it.

"Defendant's counsel: Now, in justice to opposing counsel, I think that I ought to state that when this suit was instituted and when this man was making a claim, the claim department got information that he had been injured or at least claimed to have been injured down on the San Antonio·and Aransas Pass Railroad, and that he settled with them for it some time in the early part of last year. He asked us for a settlement and come to my office and seen me and talked to me about it; and I knew this at the time he was there and said nothing to him about it. The suit was instituted and of course we at once taken the matter up through the claim department with the S. A. & A. P. R., and we got the information that he claimed to have been injured on the 20th or 21st of January, 1911, when he had been at work four or five days for the S. A. & A. P. R. R.; he went went to the hospital at San Antonio, he stayed there a short ·time and came back home to Leonard. He showed who his father was and give his initials and give his name as Frank A. Key. We got information from the S. A. & A. P. R. R. and got the voucher and draft that was given it, the draft is endorsed by him and receipted by him and signed Frank A. Key.

"He wrote one letter to the S. A. & A. P. R. R. about that claim and he wrote a letter to Mr. Akers (defendant's claim agent at Greenville), and they show to be exactly the same handwriting. Now, I came in possession of all these facts, but I am sure that counsel for the plaintiff had no notice and had no thought of such a thing and that it was 'news' to them when I began to ask the questions I did yesterday and as a matter of fact when I asked him the questions again this morning I had studied about it last night and expected he would swear

positively that he never collected a dollar from the S. A. & A. P. R. R.
and that he was not hurt there, but I thought I would put it to him
again and give him every chance to correct his statement, if he would
do it. If I had really expected that he would correct it this morning
I don't know whether I would have put the questions to him again like
I have.

"Court: Well, what shall we do about it?

"Plaintiff's counsel: We desire to withdraw from the case, right
now.

"Defendant's counsel: I don't want the case to go over without any
judgment being entered; but I thought it was justice to opposing counsel
to tell them just what I had this morning.

"Hal Horton (an attorney in the office of Evans & Carpenter,
plaintiff's counsel): When this matter was called to my attention
yesterday I went to Leonard and interviewed two doctors, his mother
and his father, and, why, they, each and all, told me that so far as
they knew—and his wife, too—this plaintiff had never been ruptured;
and Dr. John Pendergrast told me the same thing; and I came back
here this morning with that information myself and cross-questioned
the plaintiff at the time.

"Court (addressing plaintiff, who is still on witness stand): Mr.
Key, your attorneys have withdrawn from the case; now, I will give
you an opportunity to employ any attorney that you want to; I have to
just let you take your own course, but you have a right to employ other
attorneys to go on with your case; I can't stop the case; they have a
right to have it submitted to the jury in some way.

"(Defendant's counsel then examined the witness further as fol-
lows): Q. (Hands witness paper.) That is your signature. A. Yes,
sir. Q. That draft is dated February 15, 1911, for $1,000.00, ain't it?
A. Yes, sir. Q. Now, that is your signature right there on this
voucher (shows the witness voucher for $1,000.00)? A. Yes, sir.
Q. And you signed that (Frank A. Key)? A. Yes, sir.

(At this juncture of the case the defendant's counsel calls Evans &
Carpenter or rather steps aside with them to the back of the court room
and exhibits the voucher and draft for $1,000.00 and other investigation
papers. In the meantime Hal Horton, an attorney in the office of Evans
& Carpenter, steps over to the witness and has a conference with him,
then asks in the presence and hearing of defendant's counsel that the
witness be permitted to take a non-suit.)

"Defendant's counsel: I don't think it is proper for him to take a
non-suit in this case, and run us to the expense and we don't think it
would be right. . . . Witness (still on witness stand): I am going
to take a non-suit on it.

"Defendant's counsel: Now, in the condition this matter has gotten
in, matters have developed that we can not anticipate what the witness
would say about it, then we will ask your honor to give us twenty minutes
to prepare a pleading in this case before you rule on the question

of non-suit. Now, I will ask that the plaintiff be instructed to stay in the courthouse and when I prepare the pleadings I will want to ask him some other questions. The court: Mr. Key, you will just remain in the courtroom. The plaintiff's counsel: I don't think there is anything your. . . . Defendant's counsel (after being out about thirty minutes): We ask leave to file first trial amendment. Court: Is your trial amendment affirmative pleading asking for any relief? Defendant's counsel: Yes. The court (after looking at defendant's pleading just filed): 'All right, the plaintiff asks for a non-suit, do you desire to use him as a witness. Defendant's counsel: Yes, I desire to use him on the non-suit. The court: Well, the plaintiff takes a non-suit; there is no case in court. Defendant's counsel: (Here reads his trial amendment to the jury).

"The court (addressing the witness, who is still on witness stand): Now, you understand the plaintiff has taken a non-suit; he has no suit against the railroad in court; now, you desire to use him as a witness. I feel it my duty as the man is ignorant in regard to the rules of law that the witness is not compelled to answer anything that will incriminate him and so far as. . . . Witness (here interrupts court): Well, I want a non-suit and I have to go home. Court: Go ahead with the examination of the witness." Other similar excerpts might be cited.

Outside of the questions propounded to appellant, and his answers thereto, none of this matter would have been admissible in evidence, had that part of the transcript been offered as evidence, and yet the jury was permitted to take it with them in the privacy of their room, read and consider it, and that it was read and considered is shown by the testimony of Messrs. Green, Murphy and Davis heard on the motion for a new trial. These men swear that they were on the jury who tried appellant; that the jury had arrived at no verdict until this transcript was called for and delivered to them; that they had two copies of the transcript, and one of the jurymen asked the questions and another read the answers, and that the entire transcript was perused by them, and then it was that a verdict was reached. It is manifest that the jury received and considered other evidence than that adduced on the trial, bearing on a material issue in the case, and this will necessitate a reversal.

There are a number of bills of exception in the record, some of which show that witnesses after testifying to facts showing an intimate acquaintance and knowledge of appellant were asked their opinion as to his ability to remember matters unless his attention was specifically called to the matter. As illustrative of these bills we will copy the one relating to the testimony of Dr. J. H. Thompson. The doctor had testified that he knew defendant, had known him for twenty years, and had been the family physician of his father during all the time defendant was growing to manhood, and had practiced in defendant's family since he had left home, and other facts, when the following question was

propounded to him: "Now, in the condition that you have stated he (defendant) is, what, in your judgment, would be the condition of his memory, speaking as a physician?" Objection was made, when defendant's counsel restated the question: "I will ask the doctor from what he had observed and what he knew of defendant's mental condition, what effect it would have on his memory?" The objection was that he was not an expert on mental diseases, and an answer would be but an opinion, which objection was sustained. The bill shows the witness would have answered that, under defendant's peculiar condition and under his physical and mental make-up, and from his acts, conduct and general deportment, and from what he knew of the defendant, and from what he, as a physician, had observed of the defendant in his acts, his conduct and his conversation, that the defendant's memory, necessarily, was bad, and defendant would be slow to recall past incidents, unless his mind had been specially directed to the particular circumstances, time and occasion. This was error, as in a number of cases we have held that when one's mental state is an issue, that those not experts may be permitted to testify where they show intimate acquaintance and dealings with, and knowledge of one's habits and conduct. This question is discussed at length in Jordan v. State, 64 Texas Crim. Rep., 187, 141 S. W. Rep., 786, citing authorities, and the correct rule there stated, and under this case the testimony of Dr. Thompson was admissible as well as that of the witnesses Dooly and Mrs. Key.

There are several complaints of the charge of the court, and especially that the charge as given did not properly submit the defense of defendant in an affirmative way. We feel sure this will not occur on another trial, for when this additional testimony is admitted, which we have herein ruled should have been admitted, the court will appreciate the necessity of presenting in an affirmative way the defense relied on, if the testimony on another trial tends to prove the same defensive theory as relied on in this case.

The judgment is reversed and the cause is remanded.

*Reversed and remanded.*