### GEORGE MIZELL v. THE STATE.

#### No. 4397.   Decided May 2, 1917.

**1.—Rape—Continuance—Practice on Appeal.**

Where the judgment is reversed and the cause remanded for other reasons, the overruling of the application for a continuance need not be discussed.

**2.—Same—Evidence—Credibility of Witness.**

Where the prosecutrix had first accused her brother with the crime of incest, and when told by the State's attorney that this would put her brother in the penitentiary, she thereupon accused the defendant, who was thereafter indicted for rape and incest, the defendant should have been permitted to show this state of facts in attacking the credibility of the prosecuting witness. Prendergast, Judge, dissenting.

**3.—Same—Misconduct of the Jury—Testimony dehors the Record.**

Where it was shown on motion for a new trial that the jury discussed in their retirement, the good character for truth and veracity of one of the State's witnesses whose character had not been attacked and no such testimony had been introduced upon the trial, and this matter seems to have influenced some of the jurors in finding the defendant guilty of rape instead of incest, the same was reversible error. Prendergast, Judge, dissenting.

**4.—Same—Allusion to Defendant's Failure to Testify.**

Where, upon trial of rape and incest, the jury during their deliberations discussed the fact that defendant did not testify and this seemed to have weighed on the minds of some of the jurors in finding the defendant guilty of rape instead of incest, and giving him a larger penalty, the same was reversible error. Prendergast, Judge, dissenting.

Appeal from the District Court of Angelina.   Tried below before the Hon. L. D Guinn.

Appeal from a conviction of rape by force; penalty, twelve years imprisonment in the penitentiary.

The opinion states the case.

*Mantooth & Collins,* for appellant.—On question of misconduct of jury:   Cited cases in opinion.

*E. B. Hendricks,* Assistant Attorney General, for the State.

DAVIDSON, PRESIDING JUDGE.—Appellant was convicted of rape by force and given twelve years confinement in the penitentiary.

The indictment contains two counts, one charging rape and the other incest.   The facts show that the prosecutrix was appellant's niece.   His wife was in bad health and appellant induced prosecutrix, with the consent of her mother, to come from her home in another county to stay with his, appellant's, wife.   After remaining at appellant's home about three weeks she and appellant's wife disagreed so that prosecutrix concluded to return home.   Appellant took her to Lufkin to meet a night train.   After arriving there they went to the hotel owned by the

witness Fuller, engaged a room and retired. They occupied the same room. Appellant put in a call for himself about 5 o'clock in the morning. It seems that the train passed Lufkin at about that hour. The State's theory is that he had intercourse with the girl while in the room and over her protest. She testified to those facts, and also to some matters which tended to excuse her for not making an outcry. She gave as a reason for not making an outcry that defendant made certain statements to her which tended to terrorize her. Mr. Fuller, a State's witness, testified that he heard noises in the room occupied by them, and among other things that somebody was sobbing or crying. The next morning when the girl was questioned about the matter, and perhaps taken in charge by the authorities, she gave her name as Lillian Jones, and stated that her brother, Charley Jones, spent the night in the room with her, and that she was sobbing and crying because her brother had notified her of her mother's death. She was carried before the grand jury and made these or similar statements. After being informed that an accusation would be brought against her brother for incest in another county, she changed her testimony and imputed the whole matter to appellant. This was a case of rape by force and without the consent of the prosecutrix. If she agreed to it or did not make sufficient resistance to come within the statute of rape by force, this case would not be one of rape under that count in the indictment, but if the act of intercourse was consummated it could and would be a case of incest. This was one of the serious questions and perhaps the most serious question in the case.

There are several bills of exception in the record. That with reference to the application for continuance is not discussed as it may not arise upon another trial. The witnesses can be obtained.

Bill No. 8 was reserved and this quotation is made from it: "I will ask you if they did not talk to you for some time about the fact that it would put your brother in the penitentiary, and if they did not indicate to you that if you would tell on this defendant they would drop and would not consider any further action about your brother, and what you had said about it (this had reference to the testimony of prosecutrix before the grand jury and the contention of defendant that before she told on defendant they had offered her brother immunity from a charge of incest in Montgomery County) and the State objected to the admission of said proposed testimony, to permitting the witness to answer such question, and the court sustained same, to which the defendant then and there excepted and tenders this his bill of exception, for the reason that he expected to prove by the witness that she was promised immunity for her brother, or that in some way it was substantially indicated to prosecutrix that if she would disclose on this defendant she and her brother would be given immunity and no punishment would follow, otherwise her brother would be subject to a prosecution for incest, and an affidavit would be forwarded to the

district attorney of Montgomery County to enable him to base the charge."

While this bill is somewhat indefinite and not sufficiently full, yet upon another trial this matter should be permitted to go to the jury if denied by the prosecuting witness. These remarks with reference to this matter are made in passing so that upon another trial if the matter comes up it will be proper for the defendant to show this as attacking the truthfulness of the prosecuting witness and as to her reasons for changing from her original statements showing that her brother was with her in the room and not the defendant.

Another bill alleges misconduct on the part of the jury in two respects: First, that they received testimony with reference to the character and standing of the witness Fuller that was not in evidence on the trial; and, second, comment and discussion of the failure of the defendant to testify in his own behalf. The testimony shows beyond question that whatever there is in this case occurred in Fuller's hotel, and that he was an important witness and heard some of the noise which he testified was carried on in the room occupied by appellant and the girl. His reputation for veracity and as being a man of good reputation was not placed in evidence. There was nobody in the room with appellant and the girl; they occupied it alone, and no witness could have known what occurred except the two. Fuller overheard some noises and confusions and sobbing and crying, but was not present in the room, and interposed no interference in these matters, although they occurred in his hotel, and he and the girl both knew that no outcry was made. There was nobody then who could testify to the immediate facts except the girl and the defendant, and Fuller was the State's main corroborating witness.

The affidavit of Chester Davis was attached to the motion for new trial setting up misconduct of the jury in both respects. This affidavit was introduced in evidence on the trial of the motion in addition to the affiant's evidence, and several of the jurors testified in regard to these matters. Among other things, it is shown: "I was on the jury that tried George Mizell. He was sentenced for twelve years. During the deliberations of the jury the fact that the defendant did not testify was discussed by the jury. Some of the jurors said that the defendant did not get on the stand and deny anything. They argued what the prosecutrix and others swore against defendant must be true or else defendant would have gotten on the stand and denied it. They said he must be guilty or he would have gotten on the stand and testified that he pleaded not guilty and then would not get on the stand and testify or deny anything that was testified to against him. Several times when an argument was being advanced in favor of defendant against the truth of some statement testified to against defendant some of those jurors favoring rape and the highest punishment would meet the argument by saying that if it was not so defendant ought to have taken the stand and denied it. About three of the jurors were in favor of find-

ing the defendant guilty of incest on.y, while the others wanted to find him guilty of rape. Several of the jurors wanted to give him fifty years, and some were for twenty-five. Some of the jurors were for as low as ten years, before the conversations above set out about the defendant's failure to testify. In discussing the evidence of prosecutrix some of the jurors said that if it was not true, defendant ought to have gone on the stand and explained it. All this discussion about defendant's failure to testify took place after we retired to consider of our verdict and before we had agreed whether it was rape or incest, and before we had agreed on the penalty. After we had retired to consider of our verdict and before we had agreed as to whether it was rape or incest, and before we agreed on the punishment, some one of the jurors suggested that they did not believe all of what old man W. R. Fuller, a State's witness, testified while on the stand. Some other jurors spoke up at once and said they had known old man Fuller for many years, and knew personally that he was a truthful, honest and straight man, who would not tell anything but the truth. Several others on the jury agreed to this last statement about knowing him personally and knowing him to be truthful, straight, honest and honorable. Those who suggested that they did not believe all Mr. Fuller said about the matter was some one of the jurors who were in favor of a low punishment. Quite a good deal was said by different members of the jury about their being personally and intimately acquainted with Mr. Fuller for many years and knowing him to be truthful and a man of splendid reputation." This juror was for convicting for incest and assessing his punishment at ten years in the penitentiary, but he says: "After all of the discussion about the defendant's failure to testify and the splendid reputation of Mr. W. R. Fuller by those represented that they had known him for many years I finally agreed to convict the defendant of rape and give him twelve years confinement in the penitentiary." Further he says: "I did not know anything about his reputation as to whether he was a reliable man or otherwise until after I heard the discussion of his reputation by other members of the jury. The statements made by other members of the jury as to the splendid reputation and truthful character of Mr. Fuller and the argument about the defendant's failure to testify had some influence on me in finally agreeing to find the defendant guilty of rape and giving him twelve years in the penitentiary."

Mr. Mann, foreman of the jury, says: "I was for incest with the highest penalty—ten years. There were two others with me, Mr. Harry Hays and Mr. Chester Davis. That was when we first went out. Between the time when we first went out and the time we finally got together on a verdict of twelve years for rape the matter about the defendant's failure to testify was mentioned several times—it was mentioned several times." This witness further stated: "It is my recollection that Mr. Russell went over that and Mr. McGaughey. I don't know hardly how it came up and how they would mention it, but they

would make him guilty for it, they would make him guilty for not testifying. I don't know whether they argued much about it or not but there was a good deal of argument out there, and I heard that mentioned several times. I was not arguing that he was not guilty of rape, but was arguing that I was not satisfied to convict him for rape; I was of the belief that it was incest, and they wanted to make him guilty of rape because he did not testify, is the way that it was I think. I don't know how it came up, but I was not satisfied with the evidence enough to convict for rape at first and argued that, but some of the others said it was rape and wanted to make him guilty because he did not testify. I don't know what all was said—so much was said—but several seem to view it that he was guilty because he did not testify, but to tell you just what was said I couldn't do it now. We were arguing in there a good long time; some said he was guilty of incest and some rape, and in that argument it was argued a good deal about him not testifying." Again: "I heard some men on the jury say they knew W. R. Fuller who testified for the State; that they they knew him personally and knew what sort of a man he was. As to whether or not anybody said he was a good fellow, everybody agreed to that. I think I heard some say that they had known Mr. Fuller for years; I heard that mentioned a good deal. Mr. Fuller's evidence was discussed a good deal, you know. I understand that when we first went out Chester Davis was for conviction for incest· and giving him ten years. I do not know whether he agreed to convict for rape before or after it was discussed about Mr. Fuller. I think Mr. Fuller's testimony was discussed all along before and after that. I think when that was first mentioned Mr. Davis was for incest and ten years, but after that he agreed to convict for rape and twelve years. When we first went out Mr. Davis and Mr. Hays and myself were for incest and ten years. After considerable argument we agreed to rape and twelve years. I have already told you that some of the jurors mentioned the fact that the defendant failed to testify, but I could not tell you who that was, but I think Mr. McGaughey and Mr. Russell had the most to say about it. Mr. Russell was for conviction and rape at first but I don't know what penalty he wanted. They were scattered all along, I don't know just how many years he wanted. He wanted to give a higher punishment than I wanted to give, and Mr. McGaughey was the same. I wanted to give ten years for incest, but some of the others would not come down, didn't want to come under fifteen years for rape, and we finally agreed on twelve years for rape. I think Mr. Coupland suggested twelve years for rape, and I put it to a vote and all voted that way. Three of us before that had voted for ten years and incest. I remember Mr. Coupland reading that paragraph of the charge wherein the court instructed the jury not to consider the failure of the defendant to testify, but I don't think it is true that that was the last time it was mentioned; it was discussed all along as far as that is concerned I don't believe I mentioned about him not testifying. I know some

of them mentioned it all along off and on during the time we were out but I don't think I ever mentioned it." Chester Davis testified. His testimony is not materially different from his affidavit already mentioned. In answer to this question: "Now, you finally agreed to the verdict of twelve years for rape; I want to know if what they said about Mr. Fuller being a truthful and honest man had any influence on you finally agreeing to a verdict of rape and twelve years?" He responded: "I think that would have influenced any man, because it is like this—." Here the State interposed objection, which was sustained by the court. Further the witness stated: "There seemed to be several of them just like I was about Mr. Fuller's testimony. I think it influenced me some—I will say it did influence me some." Again he states: "I think it influenced me to some extent." The following is also quoted from his testimony: "After we went out in the jury room and had been there a few minutes we elected Mr. Mann foreman and he gave the charge to Mr. Coupland to read. I believe it is true that Mr. Coupland read that paragraph in the court's charge where the court told us not to consider the defendant's failure to testify, but some of them had mentioned that before then. There was something said two or three different times before the court's charge was read about the defendant not testifying. After it was read some of them said we shouldn't consider that matter. It was mentioned after that about the defendant not offering any testimony; that no witnesses were offered by the defendant's side. That, is what was said about that—that no witnesses testified on the defendant's side, and some said something about him not going on the stand. Some of them said the girl had testified, and I think Mr. Hays raised the question about the truthfulness of her testimony, and then it was mentioned about Mr. Fuller's testimony, and then someone said the defendant's side did not put anyone on the stand to deny it, and it was mentioned about the defendant not going on the stand and testifying too. When we first got in the jury room is when I first heard it mentioned about the defendant not going on the stand, but that is not the only time I heard it."

Mr. Coupland testified he did not hear any of the testimony with reference to the defendant's failure to testify, but he says: "I remember hearing someone say that they didn't see why the defendant didn't put anyone on the stand, and that is all I heard about that; someone just said they didn't see why the defendant didn't put anyone on the stand." With reference to Fuller he says: "I think someone said something about his reputation being all right or something to that effect, but I wouldn't undertake to say that is just what was said." This witness wanted to convict for rape and twenty-five years, which he says was his top notch.

Russell testified substantially as did Coupland. He says: "I never mentioned defendant's failure to testify myself, but it occurs to me that when we first went out someone said, and it may have been me, that we were surprised at not hearing any of defendant's witnesses. I may

have said that I was surprised at no witnesses being put on the stand by the defendant's side."

McGaughey testified: "I remember someone reading the charge and I remember it said something about us not considering the fact that the defendant didn't testify, but I don't remember whether anyone said then, 'Boys, we must remember that.'" He did not remember any discussion in the jury room about it. He was for twenty-five years and rape He says he did not know whether he took a great deal of interest in trying to get a conviction for rape; he says that he was doing what he thought was right about it, and says "he was for rape first, last and always."

The witness Breazeale testified: "I have known Mr. Fuller personally for a number of years and I have always regarded him as a truthful and honorable man. I don't think he would swear a lie. I never heard anyone question his evidence. I told the jury I had known Mr. Fuller for a number of years, as he moved into our settlement when he came from Newton County, and that I had known him always to be an honorable and upright man and I didn't believe he would swear a lie. I believed everything he said. I don't know how many jurors I heard say they knew Mr. Fuller personally, but possibly I heard one or two say that. I heard several say they knew him personally and knew he had a good reputation. I heard that before we agreed on the verdict and before we assessed the penalty, but we were all for conviction as soon as we went out. I heard that mentioned before we agreed or assessed the penalty."

Another witness says that when they went out the court's charge with reference to not discussing the fact that defendant did not testify was read. He said it was said that that had nothing to do with it. "After that I heard someone speaking something about the defendant not going on the stand and testifying. Someone said, 'I guess he thought there was no use—didn't have any witnesses to put on the stand,' or something to that effect. If anybody said the defendant had pleaded guilty and then wouldn't go on the stand and deny it, I don't know who it was. All of them seemed to discuss that some, but I couldn't name them now. The failure of the defendant to testify wasn't discussed so very much. It was mentioned but most of them would say that didn't have anything to do with it. I couldn't tell you whether anyone said if it wasn't so why didn't the defendant take the stand and deny it, as I don't know just what all was said. I think I heard someone say they wondered why the defendant didn't go on the stand and then somebody remarked that that didn't have nothing to do with the case I don't know how long before the verdict was rendered that happened, but it was a good while. I don't know whether it was an hour or two or not for it was mentioned more than once."

The court in qualifying the bill says: "I concluded that the jury did not discuss the failure of the defendant to testify, but that defendant did not offer any evidence to contradict the witnesses and that the court

charged the jury not to consider the matter of the defendant not testifying and when the jury read this part of the charge it was stated by the jury that the jury must not consider such failure of defendant to testify. As to the witness Fuller's reputation, the evidence taken on the motion for a new trial is referred to and I concluded that the verdict of the jury was not affected by same."

Further detail of this evidence, in the mind of the writer, would be unnecessary. There seems to be two rules with reference to defendant's failure to testify: one is what is termed a bare allusion in the jury room to defendant's failure to testify when immediately suppressed will not of itself cause the judgment of conviction to be set aside. These cases will be found collated in Mr. Branch's Ann. Penal Code, on page 293. The second rule is that an allusion to or discussion of defendant's failure to testify is error, and an indirect reference to defendant's failure to testify is as much error as a direct reference to such failure. These cases will be found collated on page 209 in section 374 of Branch's Ann. Penal Code. See also Huddleston v. State, 70 Texas Crim. Rep., 260; Walling v. State, 59 Texas Crim. Rep., 279, 128 S. W. Rep., 624; Richards v. State, 59 Texas Crim. Rep., 203; Stone v. State, 182 S. W. Rep., 193; Buessing v. State, 63 S. W. Rep., 318. In Huddleston v. State, supra, it is said that persistence of one or more jurors in bringing up the subject of defendant's failure to testify makes a mere allusion or reference thereto become a matter of importance. The quotations from the testimony on motion for new trial we think presents this matter clearly and sufficiently strong to show that before they agreed on the punishment and before they agreed as to whether defendant was guilty of rape or incest, that his failure to testify was discussed by the jury both before and after reading the charge. The State evidently by its examination and cross-examination as developed by the quoted testimony undertook to show that because when the matter was mentioned some of the jurors would say that we must not consider that; that, therefore, it was not considered; at least it was not sufficient to require a reversal of the judgment. There is too strong an indication here that this allusion to and discussion of defendant's failure to testify was attended by too many cautions not to consider it, to say that this would come within the rule of bare allusion. It would not do to hold that where jurors discussed the failure of a defendant to testify that because other jurors cautioned that they could not consider it and this continued through their retirement, that this would relieve the case of prejudicial misconduct of the jury. This would amount to practically a travesty on the statute.

As to the other question of misconduct, that is, the use of testimony not delivered before the jury in regard to the good reputation of Mr. Fuller, this ought not to raise a question of why this verdict ought not to stand. The rule is settled in Texas, as we understand it, that a new trial will be granted where the jury after being retired to deliberate upon the case has received other testimony, and when a juror testifies

to his fellow jurors during their deliberations and vouches for the credibility of a material State's witness the jury has received other testimony. Tate v. State, 38 Texas Crim. Rep., 261; Blalock v. State, 62 S. W. Rep., 571; Battles v. State, 53 Texas Crim. Rep., 202; Key v. State, 72 Texas Crim. Rep., 129. 161 S. W. Rep., 130; Knight v. State, 66 Texas Crim. Rep., 335, 147 S. W. Rep., 268; Williamson v. State, 62 Texas Crim. Rep., 132; Horn v. State, 50 Texas Crim. Rep., 404, 97 S. W. Rep., 822; Branch's Ann. Penal Code, p. 292.

It seems to be practically conceded in this record that Mr. Fuller became the subject of discussion. There was no attack made upon Mr. Fuller's testimony by the defendant, and, therefore, none offered to sustain it by the State. This was a matter that came up only in the jury room and not on the trial. Several of the witnesses stated in the jury room to their fellow jurors that he was an honest, law-abiding man and a truthful, straight man. Under the authorities cited this was clearly receiving testimony after their retirement which was not before them on the trial. That these matters affected the verdict in this case is not questioned, as the writer understands this record. Three or four of the jurors were for incest with a punishment of ten years. By reason of these matters of misconduct of receiving other testimony and comment on the failure of defendant to testify these jurors changed their views and consented to a verdict of twelve years for rape. It was a very crucial question, conceding the State's testimony to be true that defendant was the man in the room with the girl at the hotel, that it was incest and not rape. Defendant, of course, was fairly interested in the verdict as much as the State. This testimony did change at least three of the jurors from incest and ten years to a conviction for rape with twelve years. That these jurors were affected by this testimony unfavorably to the defendant is not the subject of doubt. This was not only injurious but shown to be affirmatively so by the testimony. The law has made a distinction between rape and incest and the punishment attached to the two offenses. Under the incest view appellant could not have had in excess of ten years. Under the rape view of the case he could have had assessed against him a punishment far in excess of twelve years, but the jury did award him two years higher for rape than some of the jurors were willing to give him had they remained of the opinion it was incest. This is shown affirmatively to be true. It did increase the offense and the punishment with them, and they testified in substance and one of them expressly that it had a bearing on his verdict and changed him as it did the other two from incest to rape.

For the reasons indicated the judgment is reversed and the cause remanded.

*Reversed and remanded.*

PRENDERGAST, JUDGE (dissenting).—This is an appeal from a conviction of rape with force committed by appellant upon his sixteen-

year-old niece, with his punishment assessed at twelve years in the penitentiary.

He contends that the evidence is insufficient to sustain the conviction and that the court erred in refusing his special charge peremptorily requiring the jury to acquit him of said offense. All the evidence has been read and carefully studied. The evidence was sufficient to sustain the conviction. The substance of it will here be stated.

Appellant was a married man, had been married some years and lived at Lufkin with his wife and two children, one eight and the other three years old. He weighed about 200 pounds, was about five feet nine inches tall and was a strong, robust man. His wife for a long time was sickly from some female trouble. Early in October, 1916, he went from his home to the home of his niece's parents, who lived in Montgomery County, about five miles in the country from the railroad town of Splendora, and induced her parents to let their daughter, the assaulted girl, named Mollie Hough, return with him to his home for the purpose of her assisting his wife in doing the household work, cooking, washing, etc., because of the condition of his wife. The girl at that time was staying in Splendora attending school. At first her mother, his sister, refused to let her go on that account, but upon his stating to her that they had a good school at Lufkin which she could attend and that he would take good care of her and furnish her plenty of good school clothes, she consented that her daughter might go with him. He went back to Splendora, got the girl and took her to his home. She remained at his home about three weeks, worked at his home during that time and went to school there about two weeks. Trouble arose between her and his wife, and she thereupon determined to return home on the night of October 29th with his consent. After supper that night he took her from his home, first, to one of the railroad depots, then to a hotel where she left her grip, then to a drug store where he left her for a time, telling her that he would have to get some money for her with which to pay her railroad fare home. She remained about the drug store some time, until it closed up. She then saw him, and he told her to go to a certain restaurant and wait for him there, which she did. He went back there for her about 9 o'clock, then took her to another hotel in the town, reaching there between 9 and 10 o'clock. The lights of the hotel had been extinguished, and the proprietor, Mr. Fuller, and his family had gone to bed. Mr. Fuller's brother, it seems, was still up, and appellant applied for and procured a room upstairs. He and the girl were taken to the room, and he there gave Mr. Fuller's brother a five dollar bill to pay for the room. This was taken down to Mr. Fuller for change, which was procured, and taken back up by his brother to appellant. At this time appellant told him to call him at 5 o'clock. He put in no call for the girl, and neither did she, other than his call for 5 o'clock. This was in her presence and she heard it.

There was but one bed in the room. As soon as he got his change he closed and locked the door.

The girl testified she was unwilling for him to stay in the room and asked him a time or two to go, but he refused. He told her that he was going to stay with her; that he didn't know when he would see her again; that he wasn't going to bother her; and she consented for him to stay. That she removed her shoes and top dress only and went to bed. That he removed his shoes and pants and lay down on the same bed. That she was unwilling for him to do that. He didn't tell her why he was lying down on the bed and she didn't know what he meant by it. Soon she went to sleep and was later awakened by his trying to feel of her, and when she awoke he had his hands on her private parts. She asked him to quit. He refused and kept on, going further and further, and she kept on begging him to quit and cried, and he wouldn't quit. She then detailed his conduct towards her. That she repeatedly got off of the bed to go to the door and escape, but he would immediately jump up, catch her and throw her back on the bed and get on top of her. That she wormed and screwed around and tried to work him off of her, tried to push him off with her feet and hands but couldn't do so. He was much stronger than she was. That he didn't tell her what he was trying to do, but she then knew from his actions that he was trying to have intercourse with her. That all this was going on for a long time from soon after they went up into the room and she lay down until towards 11 o'clock, when he finally overcame her and by force succeeded in having sexual intercourse with her. That she was crying and begging him all the time to desist. That she didn't holloa because he told her if she did he would have her put in jail and they would arrest her and put her in jail, and she was afraid to holloa. That she did everything she could trying to keep him from ravishing her. That finally she got away from him one time and got under the bed. That he caught her and pulled her out, put her on the bed again, got on her, forced her legs apart, tore her drawers open and accomplished the act. That when about to succeed, she told him she was going to holloa anyhow and started to do so, but he put his hand over her mouth, and she couldn't. That she exerted all the strength she had in trying to keep him off of her and tried to prevent his having intercourse with her. That she tried every way she could to prevent the act. That just after he had thus completed the act and accomplished his purpose, the proprietor came up and asked in substance what their conduct meant. That she was then crying and her uncle told her to hush and not say a word or the proprietor would take her and put her in jail and if she said anything would put her in jail. That Mr. Fuller then went downstairs. Her uncle jumped up, put on his pants, took his jumper, coat and shoes in his hands and. fled. That she never consented to his said act with her but that it was without her consent, and she exerted all the strength and power she had to keep him from doing what he did.

Mr. Fuller, the proprietor, testified that soon after appellant procured said room and he and the girl went to it he went to sleep; that later his wife awakened him, and he heard the racket in the room occupied

by appellant just above the one he and his wife occupied; that it was a constant rustle, lumbering about, heavy falling on the bed, getting off of the bed onto the floor, the girl crying. His testimony substantially corroborated that of the girl as to the struggling, her crying, etc. So far as he could tell it and judge it from the sounds which occurred and which he heard, Mr. Fuller said that when he could stand this no longer he went up, knocked on the door and asked: "What in the devil is going on here?" That everything became perfectly still, and he asked again and appellant said: "Not me." He asked if he was asleep and appellant replied, "Yes." And he asked if his light was burning, and he said, "No." He then told him: "This cutting up has been going on all night, and I have been putting up with it as long as I am going to." That he then returned downstairs, 'phoned for the sheriff and one of his deputies. That immediately upon his return downstairs appellant broke to run as if he was going down the back stairs, and he ran to the foot of that stairs to head him off. Thereupon, appellant ran back the other way, went out the front door running before he could stop him and that he thus ran away. That he had his shoes and some of his clothes on his arms. He had not put on his shoes nor all of his clothes. Much more testimony on these lines could be detailed, but it is unnecessary.

It is true that the girl herself, the officers and Mr. Fuller all testified that when they went up into the room after appellant had escaped and fled therefrom undressed, upon their inquiry of her, the girl told them her name was Lillian Jones; that it was her brother Charley Jones who had been in the room with her; that he had come from Tyler and met her there at the train and took her to this hotel and that it was him who was with her. That when she was asked if he had bedded up with her, she made no reply and stated that the cause of her crying was that she had just heard that her mother was very sick. That she told that she was fifteen years old when in fact she was sixteen. That the officers then took her to jail, and that after they reached there with her and she was inside, appellant came there, and when asked what he wanted told the officers he wanted to see the girl and take her out of there and that she was his niece. That the girl then broke down and told the officers she had not told them the truth about who it was with her and what had occurred but that it was appellant and not her brother who had been with her. The grand jury was then in session. She was taken before it the next morning, and at first testified before them she was fifteen years old; that appellant had not had sexual intercourse with her the night before but that one of her brothers some months before that had had sexual intercourse with her. Thereupon, she was told that they would take her affidavit, send it to the district attorney of Montgomery County, where she claimed that act had occurred, and have her brother prosecuted and sent to the penitentiary. She said she told this tale to the grand jury, believing that that would secure her release from jail. Upon further questioning, she then stated that

her brother had at no time'and place ever had sexual intercourse with her but appellant had the night before, and she then detailed to the grand jury the treatment of her by her uncle. She also swore before the grand jury that her given name was Louise and did not at first tell them that her true name was Mollie. She said that Louise was a nickname by which she was called.

The offense as applicable herein is: Rape is the carnal knowledge of a woman without her consent obtained by force. (Art. 1063, P. C.) The statute further is (art. 1064, P. C.) that this force "must have been such as might reasonably be supposed sufficient to overcome resistance, taking into consideration the relative strength of the parties and other circumstances of the case."

The girl on this trial, which began December 4th and was concluded December 6th, either on her direct or cross-examination, or both, testified fully to all of what she had told Mr. Fuller and the officers when they took her to jail and her testimony first before the grand jury denying that appellant had ravished her, and every other fact tending to impeach her testimony, and the further fact that when on her cross-examination she was asked if she would permit her person to be examined to see if it evidenced any act of sexual intercourse she refused to be examined, was all before the jury and no doubt appellant's able attorneys made the most of all of this impeaching testimony of her before the jury that could have been made by anyone. Yet all of it and her manner of testifying, her demeanor, etc., was before the jury, and notwithstanding it all, they being the exclusive judges of the facts, credibility of the witnesses and the weight to be given thereto, believed her testimony against appellant and found him guilty of rape. The State's testimony, measured by the law, was sufficient to sustain the verdict. She was a young, inexperienced girl, under the care, custody and protection of her uncle. She had affection for him, confidence in him and trusted him. According to her testimony, supported by that of Mr. Fuller, her uncle had carnal knowledge of her without her consent and obtained it by force and without doubt such force as not only was reasonably supposed sufficient to overcome her resistance taking into consideration the relative strength of the parties and the other circumstances but did actually overcome her by such force.

On October 30th the grand jury returned an indictment against appellant in two counts, one for rape, the other for incest, alleging that said girl's name was Louise Hough. After the case had been set for trial later and then postponed twice at least on appellant's application under that indictment, when it was learned that her true name was Mollie Hough, the grand jury preferred another indictment on November 27th so averring her name. The two indictments were the same except as to her name.

When this cause was ultimately called for trial on December 4th and the trial then began, appellant made a motion for a continuance in addition to his previous motions for postponement or continuance in

which he had succeeded on account of the absence of some nine witnesses. The State contested this application, showing that two of these witnesses were fugitives from justice and that several of the others were expected to testify solely to his good reputation as a law-abiding etc., man. The testimony of all the others, including his wife, would have been solely for the purpose of impeaching said girl.

It has always been held by this court that a continuance will not be granted for witnesses to prove an appellant's good character. Parks v. State, 35 Texas Crim. Rep., 378; Wright v. State, 37 Texas Crim. Rep., 627; Franklin v. State, 34 Texas Crim. Rep., 203; Miller v. State, 32 Texas Crim. Rep., 319; Duncan v. State, 30 Texas Crim. App., 1; Benson v. State, 38 Texas Crim. Rep., 487; White's Ann. C. C. P., sec. 611. It is unnecessary to cite the many other cases.

It is also well settled that a continuance will not be granted on account of the absence of witnesses whose testimony would only be for impeachment of a State's witness. Butts v. State, 35 Texas Crim. Rep., 364; Franklin v. State, 34 Texas Crim. Rep., 203; Fulton v. State, 43 S. W. Rep., 1010; Garrett v. State, 37 Texas Crim. Rep., 198; Rogers v. State, 36 Texas Crim. Rep., 563; White's Ann. C. C. P., sec. 612. A great many other authorities could be cited.

The court qualified appellant's bill to the overruling of his motion for a continuance as follows: "That Mr. and Mrs. Toliver and Clark Edwards could not be found, and further that Mollie Hough testified on the witness stand that she had at all times denied having anything to do with defendant, and she admitted everything that defendant set up that he expected to prove by said three witnesses; further, the defense had some fifty to seventy-five witnesses in attendance upon court, most of said witnesses being out of county witnesses and no witnesses at all were introduced by defendant. Further qualified that the witness Hugo Carter reached the court before the case was finished and could have been placed on the witness stand and the State offered to cross depositions to the wife of defendant. This case had been called two or three times before the trial started. The old indictment and the new one were for the same transaction." The court's action in this matter was not error.

In his motion for a new trial he alleged misconduct by the jury in that some one or more of them told the others that they knew the reputation of said witness Fuller and that it was good. And also that they discussed the failure of the appellant to testify. This was denied and contested by the State. The court heard the jurors testify when acting on the motion. It is unnecessary to recite the testimony by each of them. The appellant introduced three of them, and from their testimony, if believed, and there had been no other testimony contradicting theirs, it may have been sufficient for the court to have sustained his motion on these grounds, but the State then introduced the other jurors, some, if not all of them testified that no such things occurred. In the majority opinion some of this testimony, which is

most favorable to appellant, is stated, but that of the same jurors favorable to the State, as well as that of the other jurors, is not given. The true rule is stated in Lamb v. State, 75 Texas Crim. Rep., 78.

The court in qualifying his bill on this subject said: "After hearing the evidence, I concluded that the jury did not discuss the failure of the defendant to testify, but that defendant did not offer any evidence to contradict the witnesses, and that the court charged the jury not to consider the matter of the defendant not testifying, and when the jury read this part of the charge it was stated by the jury that the jury must not consider such failure of defendant to testify. As to the witness Fuller's reputation, the evidence taken on the motion for a new trial is referred to and I concluded that the verdict of the jury was not affected by same."

Clearly the judge's conclusions were amply supported by the testimony of the jury. Their credibility was a matter that he not only had the right, but it was his duty, to pass upon. He did not have to believe the testimony of those who would have supported appellant's contention when others, and more of them, testified in effect to the reverse. This court, and no judge of it, can possibly be as well qualified to determine the real facts and who was telling the truth as the judge of the trial court. His conclusion on disputed facts ought to be and is conclusive on this court.

Appellant has several bills showing that he objected to certain questions asked different witnesses, claiming that such questions were leading. As a sample, this is one of them to said witness Fuller: "Q. 'Will ask you whether or not at any time just shortly before you went and knocked on the door you heard a smothering noise up there?' (The door knocked upon was referred to as the one to the room in which the prosecutrix and defendant were at the time of the alleged commission of the offense) to which the witness answered: 'Yes, sir; crying.' " Clearly this question was not leading. It did not suggest the answer, and besides, even if it had, no prejudice is shown by asking the question under the circumstances of this case. 1 Branch's Ann. P. C., p. 90. Some of the bills on this subject were qualified by the judge; others were not. Taking the several bills, neither those that were qualified by the court nor those which were not show any such error as would authorize or justify a reversal of this case.

Appellant's bill complaining that the court refused to permit him to ask said girl a certain question as qualified by the judge shows no error.

This case without any doubt shows that appellant by force raped his own sixteen-year-old niece while she was peculiarly and specially under his care, custody, control and influence. The reversal of this case will no doubt result in his going "scott free" of any conviction. There is no reversible error. He had a fair and impartial trial, and his conviction should stand. I dissent.